[Civ. No. 2105. Fourth Appellate District.—January 21, 1938.]

MARGARET GROVE URE, Respondent, v. MAGGIO BROTHERS COMPANY, INC. (a Corporation), et al., Appellants.

Hugh B. Rotchford, Loyal C. Kelly and Robert E. Ford for Appellants.

Arthur W. Henderson and Kenneth Evan Schwinn for Respondents.

MARKS, J.—This is an appeal from an order denying a motion for a new trial, and a judgment whereby plaintiff recovered general damages in the sum of $10,000, and special damages in the sum of $881.23 for the death of her daughter. Defendants admit liability and that the evidence sustains the findings of special damages. The only question presented for our consideration is that the general damages awarded,

in the sum of $10,000, find no evidentiary support and are excessive.

The action was brought under the provisions of section 377 of the Code of Civil Procedure. The rules governing the amount of recovery in cases of this kind are set forth in *Bond* v. *United Railroads*, 159 Cal. 270 [113 Pac. 366, Ann. Cas. 1912C, 50, 48 L. R. A. (N. S.) 687], as follows:

"The rights of action being wholly statutory, the statutory rule is the only measure of damages. All the court can do is to apply it to particular cases, construing the rule in the same manner as the other code provisions, liberally, 'with a view to effect its objects and to promote justice'. (Code Civ. Proc., sec. 4.) The rule of damages stated in the last clause of section 377 is expressly made the only rule to be applied in any action under either section. . . . In actions by a parent, either for the death or the injury of a child, the damages to be allowed are those, and those only, which have been, or may be, suffered by the parent. No damages can be given in such an action for pain or anguish inflicted on the child, or for any pecuniary injury personal to such child. (*Durkee* v. *Central Pac. R. R. Co.*, 56 Cal. 388 [38 Am. Rep. 59].) In all actions, under either section, the damages are limited to the pecuniary loss suffered by the persons or person for whose benefit the right of action is given from the death or injury of the victim. (*Morgan* v. *Southern Pac. Co.*, 95 Cal. 510, 516 [29 Am. St. Rep. 143, 17 L. R. A. 71, 30 Pac. 603]; *Sneed* v. *Marysville etc. Co.*, 149 Cal. 704, 710 [87 Pac. 376], and the numerous cases there cited; *Johnson* v. *Southern Pac. Co.*, 154 Cal. 285, 298 [97 Pac. 520]; *Hale* v. *San Bernardino etc. Co.*, 156 Cal. 713, 716 [106 Pac. 83].) . . .

"In cases arising under section 377, referring to adults only and where the pecuniary loss of those who are heirs of the victim are to be considered and estimated, this is the settled rule. In *Sneed* v. *Marysville etc. Co.*, 149 Cal. 704, 710 [87 Pac. 376], the victim was an adult unmarried man, twenty-two years of age, his father and mother being apparently the only heirs. He was living with them and working out for himself. The court said: 'This pecuniary loss may be either a loss arising from the deprivation of something to which such heirs would have been legally entitled if the person had lived, or a loss arising from a deprivation of benefits which from all the circumstances of the particular case,

it could be reasonably expected such heirs would have received from the deceased had his life not been taken, although the obligation resting on him to bestow such benefits on them may have been a moral obligation only.' "

The accident in which Mary Ray Ure, the daughter of plaintiff, was killed, happened on March 28, 1936. At that time the plaintiff, aged seventy-nine years, had a normal life expectancy of about five years, and Mary, aged forty-seven years, of slightly more than twenty-three years. As the damages awarded must be compensation for the pecuniary loss suffered by plaintiff, her life expectancy furnishes the limit of time during which the damages may accrue and for which they may be awarded. (*Griffey* v. *Pacific Elec. Ry. Co.*, 58 Cal. App. 509 [209 Pac. 45, 49].)

Deceased was a lady of refinement. She had been educated as a musician and had taught music until 1916. During that year she entered upon the study of theology in the Pittsburg Bible Institute. She completed these studies in 1921 and was ordained as a minister by the Evangelization Association of that organization. She lived at the institute until 1928, assisted in religious instruction and served there as a Bible teacher and musician. She was also in charge of a mission in or near the city of Pittsburg. She received no salary for her services; only donations from communicants.

In 1928 deceased moved to her mother's apartment in Pittsburg and until early in 1935, served as housekeeper, companion, and, during 1933 and 1934, as nurse for her mother. After she took up her residence with her mother she gave up her position with the Bible institute but continued to assist at the mission.

Deceased's sister, Frances McClelland Ure, was also a minister of the gospel. She had been ordained by the same authority as Mary. Frances was pastor of a church in Farmingdale. In March or April, 1935, Mary went to her sister's home in Farmingdale where she assisted in conducting church services. During this time the sisters made preparations for a motor trip to California. Frances secured a leave of absence of one year from her church and the two sisters left Farmingdale in July, 1935, expecting to make the trip to California and return within the year.

The denomination to which the two sisters belonged paid their pastors no salary but permitted them to retain certain do-

nations out of which they were supposed to pay living expenses. On the trip west the sisters conducted a series of revival meetings. They were given rooms and meals by members of the churches and were permitted to retain donations made at the meetings. They alternated in conducting services, each retaining the donations made at the meeting she conducted. They each paid their own traveling expenses between meeting places with the exception that Frances paid all expense of operating the automobile in which they traveled as she had a little money at the start of the trip. Mary's income was not sufficient to pay her expenses and her income on the trip was augmented by several small gifts made by her mother. Mary was killed west of Indio in Riverside County on March 28, 1936.

Frances described the services which Mary rendered her mother from 1928 to 1935, as follows:

"She did everything, she cared for mother, she kept the house for mother, she cooked, cared for her physically as a nurse; she took charge of the housekeeping."

Plaintiff described Mary's services as follows: "A. Well, when Mary first came home I was pretty well; but later than that, it was in 1933 and 1934, that I had a very serious illness. Q. And what, if anything, did Mary do in connection with the home? A. She did everything in the world that loving hands could do, or hands that might have been employed to do, except the scrub work and the laundry. Q. Will you explain to the court what she did? A. During my illness she took charge of the finances, and she just made the home. She did anything that a homemaker would do. Q. Did she perform the services of— A. Of a nurse to me. Q. Did she perform the services of a nurse? A. To me. Q. To you, during your illness? A. As no hired nurse could have done it. Q. Who did the cooking? A. She did. A woman did the cleaning, but Mary did the regulation work of the home, and the marketing, and taking charge of things for me in every possible way. Q. If I understand you correctly, she did everything incident to maintaining the home for you? A. Yes, sir. It would not have been a home. Q. Except that you did hire the scrubbing or cleaning, and laundry done by outside help? A. Yes, sir. Q. How long were you ill, and for how long a period did Mary do this? A. Well, it was during 1933 and 1934 that I was really not

able to do things. . . . Q. And during the time from 1928 down to 1935, when she lived with you, did she in any way contribute to the expense of maintaining the home? A. No; she did not receive enough to do that. Q. Who maintained and paid the expenses of the home? A. I did. But I always had a feeling, when I say 'I', that it was 'we'. Q. And from 1933 down to the Spring, May of 1935, you say Mary took charge of the finances. Will you explain what you mean by that? A. I just mean that I was not able to go back and forth and do things, and that she took charge of it for me. Q. She took charge of your funds, and paid the expenses out of your money? A. Yes, sir. Q. She did not furnish the money to pay for the upkeep of the home, herself? A. No, sir. . . . Q. Did Mary receive any compensation for her services at this Mission? A. No. It was just a service of love. Q. Did she earn any moneys herself from any source? A. No. Q. You supported her and the home, did you? A. It was our home. Q. The funds to support the home you contributed? A. Yes, sir.

The plan of life of Mary and her mother to be entered upon after the trip to California is thus described by plaintiff:

"She was to be my caretaker, and come and live with me, and do what she could outside that she wanted to do, but live with me and care for me."

The condition of the health of an aged plaintiff is always a proper subject for inquiry in actions of this kind as such evidence bears upon the probable life expectancy of the plaintiff. In reply to a question put to Frances concerning her mother's health for two or three years immediately prior to the spring of 1935, she replied, "She was not well". Plaintiff's testimony concerning her state of health prior to 1935 has been quoted. She further testified that since 1935 she had been "remarkably well". Under this state of the record there is no justification for concluding that plaintiff had more than the normal life expectancy of about five years which actuaries give to persons of her age.

It is clear that deceased had no earnings, as such are usually known, for many years before her death, and that under the plan of the future life to be entered upon by her mother and herself, she would have had no earnings, had she lived, during the balance of her mother's life.

The evidence bearing upon the value of the services to be performed by Mary for her mother, had Mary lived, is extremely sketchy. There is no showing of the size of the apartment which Mary kept for the plaintiff. There is no showing of the time Mary had devoted to this work. There is no proof of the reasonable value of these services. Proof of the reasonable value of the services of a housekeeper is easy to obtain. The value of the board and room furnished by plaintiff to Mary is also capable of proof and should have been offset against the value of Mary's services. (*Griffey* v. *Pacific Elec. Ry. Co., supra.*) As Mary had no income it is probable that plaintiff had furnished her with clothes and personal effects. The record is silent on this question.

In the case of *Griffey* v. *Pacific Elec. Ry. Co., supra,* a father fifty-eight years of age, recovered $8,000 for the death of a daughter twenty-four years of age who at the time of her death was acting as his housekeeper. An appeal was taken from an order granting a new trial. In affirming the order because of excessive damages it was said:

"Though one of the elements of damage which may be suffered by the parent of an adult child is the present value of such future financial assistance as the parent might reasonably expect from a continuance of the child's life, or the present value of such future services as the parent could reasonably expect to have received had the child lived, still, in estimating the amount of such damages, it is the expectancy of life of the parent, not the life of the child, which is to be taken into consideration; for, as is usually the case, the child's expectancy of life exceeds that of the parent. (*Fordyce* v. *McCants,* 51 Cal. 509 [14 Am. St. Rep. 69, 4 L. R. A. 296, 11 S. W. 694]. See, also, *Parsons* v. *Easton,* 184 Cal. 764, 770 [195 Pac. 419].) And in estimating the pecuniary value to the parent of the services of an adult child, the jury should take into account the value of any board and lodging or other accommodations which the parent may be furnishing to the adult child, if the latter is living with his parent.

"Besides the pecuniary loss arising from the deprivation of *direct* financial assistance or from the deprivation of services, there may be, as we have said, a pecuniary loss arising from the deprivation of the 'society, comfort, and protection' of the decedent. (*Beeson* v. *Green Mountain Co.,* 57 Cal.

20, 38; *Parsons* v. *Easton, supra.*)   But while loss of society and comfort, and protection may be an element of the injury sustained by the statutory beneficiaries, it is only the pecuniary, and not the sentimental, value of such loss which may be taken into consideration in the assessment of damages. Nothing can be recovered as a solatium for wounded feelings. . . .

"Unless, therefore, the daughter's society had a very considerable pecuniary value for the father, the award of eight thousand dollars was grossly excessive.   It is true that, in estimating the damage which a surviving spouse, parent, or child may have sustained by being deprived of the society, comfort, and protection of the deceased, some latitude must be allowed to the discretion of the jury; for it is not possible to measure in exact terms of money the damage resulting from a loss of that character.   But it must never be forgotten that, in fixing the amount, the jury is always bound by the fundamental rule that the *pecuniary* value of the society, comfort, and protection is the limit of recovery for a loss of that character, and the amount allowed therefor must have some reasonable relation to the pecuniary value shown by the evidence.   In this case the father doubtless dearly loved his daughter; but 'it is pecuniary loss only, and not the loss of an object of love and affection, that the law recognizes as ground for allowing damages to the heirs of one whose death has been caused by the negligence of a third person'.   (*Parsons* v. *Easton, supra.*)"

In *Ray* v. *Pacific Gas & Elec. Co.*, 3 Cal. App. (2d) 329 [39 Pac. (2d) 812], the court held the awards of $12,500 in favor of each of two adult children for the deaths of their parents grossly excessive.   The court there said:

"The action is brought under section 377 of the Code of Civil Procedure, which authorizes a jury to award such damages 'as under all of the circumstances may be just'.   A number of cases, wherein the contention that the damages allowed were excessive was·not sustained, are cited by respondents in support of these verdicts.   The verdicts in those cases were generally for smaller amounts than those in the case at bar, and involved other elements than those here relied upon, such as the loss of support by wives or minors or dependents.   The most liberal of them is the late case of *Gilmore* v. *Los Angeles Ry. Corp.*, 211 Cal. 192 [295 Pac. 41,

45]. There a verdict of $7,500.00 in favor of a widow and two adult children was upheld. It was based upon the loss by the wife of her legal right of support and of the comfort and care which all three might have expected to receive from the deceased; and the court takes occasion to point out that the 'loss of comfort, protection and society is by no means to be classed as compensable by merely nominal damages'. Measured even by the standard of this case the verdicts here are in our opinion grossly excessive.''

The case of *Dickinson* v. *Southern Pac. Co.*, 172 Cal. 727 [158 Pac. 183], is of assistance here. The action was brought by the administrator of the estate of Samuel Dickinson to recover damages for his death on behalf of his heirs. General damages in the sum of $10,000 were awarded. In reversing the judgment the Supreme Court said:

''It appeared in the evidence that at the time of the accident Samuel Dickinson was of the age of seventy-eight years and nine months. He was survived by a wife, two sons, two daughters, and eight grandchildren. One of the grandchildren was living with Samuel Dickinson and his wife. Dickinson's occupation was that of a farmer. The only evidence of his earnings in that calling was that of the plaintiff, his son, who testified that the income of the decedent from his farm was one thousand dollars a year, and that the rental value of a place like that which he occupied would be about three hundred dollars a year. This left a return, from his labor and personal efforts, of seven hundred dollars per year, but this, as the witness testified, did not take into account any deduction for living expenses. The widow testified that her husband had been in good health and able to do a good day's work, that her life with him was pleasant, his habits good, and his companionship pleasant and agreeable. . . .

''It is not possible to measure in exact terms of money the loss which a surviving husband, wife or child may have sustained through being deprived of the comfort and society of the deceased spouse or parent. For this reason, some play is allowed to the discretion of the jury by the provision of section 377 that such damages may be allowed as under all the circumstances of the case may be just. But in fixing the amount, the jury is always bound by the fundamental rule that *pecuniary* damage is the limit of recovery, and the

amount allowed must bear some reasonable relation to the pecuniary loss shown by the evidence.

"Here, as we have seen, the deceased had a probable expectancy of less than five years of life. His earnings, assuming that they would all have been applied for the benefit of his family, would have amounted to less than three thousand five hundred dollars, during the probable remaining span of his years. The verdict for ten thousand dollars, can, therefore, be sustained only upon the theory that his life, apart from any contributions he might make from his earnings, had a *pecuniary* value of more than six thousand five hundred dollars to his widow and heirs. There is no evidence to justify such a conclusion. Eliminating, as we must, any consideration of the grief and mental suffering occasioned to the survivors by the death, it is impossible to conceive how the loss of the comfort, society, and protection of the deceased could have had a money value of anything like the amount awarded by the jury. Verdicts have frequently been set aside where the disproportion between the loss proven and the amount awarded was not so great as that which appears here. (Citing cases.)"

When we measure the facts of the instant case by the rules we have cited, and compare the amount here awarded the single plaintiff, with the awards held excessive where there were several plaintiffs, each of whom was entitled to compensation for his pecuniary loss, the conclusion is inevitable that the award of $10,000 general damages cannot be sustained without some competent evidence supporting the finding that the services which would have been rendered by Mary, had she lived, during the five years of the normal life expectancy of plaintiff were reasonably worth the net sum of $10,000, or $2,000 per year. The reasonable value of such services were susceptible of proof. The reasonable value of the benefits conferred on Mary by plaintiff in furnishing a home and the expenses of life were equally susceptible of proof. No such proof is in the record. We conclude, therefore, that the finding of general damages in the sum of $10,000 is not supported by the evidence and that on the record before us damages in that amount must be held to be excessive.

The judgment is therefore reversed and the cause is remanded for new trial, solely upon the issue of the amount

of general damages, with directions to the trial court to render judgment in favor of plaintiff for the amount of damages so found upon a determination of that issue, plus special damages in the sum of $881.23. The attempted appeal from the order denying the motion for new trial is dismissed.

Barnard, P. J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 21, 1938.