[L.A. No. 30639. Mar. 14, 1977.]

BENJAMIN CLIFFORD KROUSE et al.,
Plaintiffs and Respondents, v.
HOMER ADAMS GRAHAM, Defendant and Appellant.

## COUNSEL

Murchison, Cumming, Baker & Velpmen, Edward L. Lascher and John Baker for Defendant and Appellant.

Harney & Moore and David M. Harney for Plaintiffs and Respondents.

Richard P. Nahrwold as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**RICHARDSON, J.**—In this case we consider, among other issues, various questions regarding the nature and extent of damages properly recoverable in a wrongful death action. As to certain parties we have concluded that prejudicially erroneous jury instructions necessitate reversal of a judgment in favor of plaintiffs. In connection with defendant's motion for new trial, we examine a claim of certain jury misconduct, and will direct the trial court to reconsider that motion as it affects one of the verdicts.

Multiple plaintiffs—Benjamin Krouse, the five Krouse children, and Vinka Mladinov—brought this action for personal injuries, emotional suffering, and wrongful death against defendant, the driver of an automobile which was being operated in the City of Burbank and struck the Krouses' parked car, killing Elizabeth Krouse and injuring her husband, Benjamin, and Mladinov, their neighbor. Immediately prior to the collision, the Krouse automobile had been parked at the curb in front of Mladinov's house. While Benjamin remained in the driver's seat, his wife, Elizabeth, and Mladinov removed groceries from the back seat of the car. When Elizabeth and Mladinov returned to the curb and commenced to shut the car door, defendant's vehicle approached the rear of the Krouse vehicle, straddled the curb, and struck both women

before colliding with the rear of the parked car. The force of the impact propelled the Krouse vehicle 70 feet forward, threw Mladinov approximately 20 feet into an embankment, and hurled Elizabeth under defendant's vehicle.

Defendant admitted liability, and the trial of the case was limited to the issue of damages. The evidence and instructions to the jury concerned various theories of recovery for the respective plaintiffs, including (1) wrongful death damages for Benjamin Krouse and the five Krouse children, (2) damages for the physical and emotional injuries sustained by Benjamin, and (3) damages for the physical injuries suffered by Mladinov.

The jury returned three separate verdicts for plaintiffs in the aggregate sum of $442,000. Benjamin and the Krouse children were awarded $300,000 in a lump sum for Elizabeth's wrongful death, to be divided by the trial court between these plaintiffs. Benjamin was also awarded $52,000 for his personal injuries and emotional suffering. Mladinov was awarded $90,000 for her personal injuries. The court denied defendant's motion for new trial, which motion was supported by jurors' declarations regarding certain alleged jury misconduct.

Defendant appeals, asserting that the trial court erred in (1) instructing the jury that Benjamin could recover wrongful death damages for loss of his wife's "love, companionship, comfort, affection, society, solace or moral support, [and] any loss of enjoyment of sexual relations . . .," (2) instructing the jury that the Krouse plaintiffs could recover wrongful death damages for "mental and emotional distress," (3) instructing the jury that Benjamin could recover for his physical and emotional injuries incurred by reason of his mere presence at the accident scene, (4) admitting assertedly inflammatory photographs and testimony regarding the accident scene, and (5) denying defendant's motion for new trial.

We examine defendant's claims, combining in one section his first two contentions, both pertaining to the wrongful death instructions.

1. *The Wrongful Death Verdict*

The Krouse plaintiffs introduced extensive evidence showing that Elizabeth was a warm and devoted mother. At the time of her death she was 56 years old, had been healthy, and was an active homemaker who had recently retired as a legal secretary in order to care for her husband,

Benjamin, whose condition of emphysema, in turn, caused him to retire and necessitated considerable nursing services. Elizabeth had the primary responsibility for maintaining the family home and garden and for attending to a minor son who resided at home. Trial testimony indicated that the minor son was totally dependent upon Elizabeth for the comforts and conveniences usually afforded by a mother to a youth of his age. The evidence also disclosed a high degree of family socializing, including Elizabeth's care of her grandchildren.

a.) *Award of "Nonpecuniary" Damages to Benjamin.*

The jury was instructed that Benjamin could recover "reasonable compensation" for the loss of his wife's "love, companionship, comfort, affection, society, solace or moral support, any loss of enjoyment of sexual relations, or any loss of her physical assistance in the operation or maintenance of the home." Subsequent instructions, not challenged on appeal by defendant, further advised the jury that the Krouse plaintiffs could recover "just compensation for the pecuniary loss" each of them suffered by reason of Elizabeth's death, including "the pecuniary value of the society, comfort, care, protection, and right to receive support, if any," which plaintiffs may have lost by reason of her death.

Defendant asserts that the initial instruction improperly allowed Benjamin to recover damages for "nonpecuniary" losses. As we explain below, however, for the past century California courts have uniformly allowed wrongful death recovery for loss of the society, comfort, care and protection afforded by the decedent, despite the courts' insistence that only "pecuniary" losses are compensable. Accordingly, the challenged instruction listing comparable nonpecuniary losses was not erroneous.

The statutory cause of action for wrongful death, created in California in 1862, provided that "pecuniary or exemplary" damages were to be awarded by the jury in the amount found "just" under all the circumstances. (Stats. 1862, p. 447.) Ten years after its enactment, the statute was amended to remove the words "pecuniary or exemplary," retaining the language that "damages may be given as under all the circumstances of the case, may be just, . . ." (Code Civ. Proc., § 377.) Nonetheless, in subsequent decisional law a theory developed that damages for wrongful death were recoverable only for the "pecuniary" losses suffered by the decedent's heirs. (E.g., *Hale* v. *San Bernardino etc. Co.* (1909) 156 Cal. 713, 716 [106 P. 83]; *Valente* v. *Sierra Railway Co.* (1910) 158 Cal. 412, 418-419 [111 P. 95]; *Parsons* v. *Easton* (1921) 184 Cal.

764, 770 [195 P. 419]; *Gilmore* v. *Los Angeles Ry. Corp.* (1930) 211 Cal. 192, 201 [295 P. 41]; *Ure* v. *Maggio Bros. Co., Inc.* (1938) 24 Cal.App.2d 490, 491 [75 P.2d 534]; *Syah* v. *Johnson* (1966) 247 Cal.App.2d 534, 546 [55 Cal.Rptr. 741]; *Fields* v. *Riley* (1969) 1 Cal.App.3d 308, 313 [81 Cal.Rptr. 671].)

California case law, however, has not restricted wrongful death recovery only to those elements with an ascertainable economic value, such as loss of household services or earning capacity. On the contrary, as early as 1911, we held that damages could be recovered for the loss of a decedent's "society, comfort and protection" (*Bond* v. *United Railroads* (1911) 159 Cal. 270, 286 [113 P. 366]), though only the "pecuniary value" of these losses was held to be a proper element of recovery. Other cases have held admissible such evidence as the closeness of the family unit (*Griott* v. *Gamblin* (1961) 194 Cal.App.2d 577, 578-579 [15 Cal.Rptr. 228]), the warmth of feeling between family members (*Benwell* v. *Dean* (1967) 249 Cal.App.2d 345, 349 [57 Cal.Rptr. 394]), and the character of the deceased as "kind and attentive" or "kind and loving" (*Cook* v. *Clay Street Hill R. R. Co.* (1882) 60 Cal. 604, 609). Not only was wrongful death compensation awarded historically to heirs who had been financially dependent upon their deceased relatives, but adult children received substantial awards for the wrongful death of retired, elderly parents (e.g., *Griott* v. *Gamblin, supra*) and parents received compensatory damages for the death of young children (e.g., *Parsons* v. *Easton, supra*, 184 Cal. 764; *Daggett* v. *Atchison, T. & S. F. Ry. Co.* (1957) 48 Cal.2d 655, 666 [313 P.2d 557]). These cases suggest a realization that if damages truly were limited to "pecuniary" loss, recovery frequently would be barred by the heirs' inability to prove such loss. The services of children, elderly parents, or nonworking spouses often do not result in measurable net income to the family unit, yet unquestionably the death of such a person represents a substantial "injury" to the family for which just compensation should be paid.

Two earlier opinions discussing the loss of society, comfort, care and protection, disclose the rationale underlying the "pecuniary value" limitation. In *Bond* v. *United Railroads, supra,* 159 Cal. 270, we explained: "The rule that allowance may be made for pecuniary loss from deprivation of society, comfort, and protection of a son is apparently settled and cannot now be disturbed. It is evident to us, however, from the cases that have come before us, that it often leads to extravagant verdicts in which the jury, in fact, allow a supposed compensation *for sad emotions and injured feelings,* instead of confining

their verdict to the actual pecuniary loss. . . . Juries should be insistently cautioned not to allow compensation for the sorrow and distress which always ensues from such a death, . . ." (Pp. 285-286, italics added.) A similar concern was echoed in *Ure* v. *Maggio Bros. Co., Inc., supra,* 24 Cal.App.2d 490, in which the court in these words warned that juries may be awarding damages for grief and sorrow instead of limiting recovery to the properly compensable elements of support, society, comfort, care and protection: " 'But while loss of society and comfort, and protection may be an element of the injury sustained by the statutory beneficiaries, it is only the pecuniary, and not the sentimental, value of such loss which may be taken into consideration in the assessment of damages. Nothing can be recovered as a solatium for wounded feelings. . . .' " (*Id.,* at p. 496.) We expressed similar principles in *Parsons* v. *Easton, supra,* 184 Cal. 764, 770, and *Dickinson* v. *Southern Pacific Co.* (1916) 172 Cal. 727, 732 [158 P. 183].

While the cases uniformly have held that a wrongful death recovery may not include such elements as the grief or sorrow attendant upon the death of a loved one, it is both unnecessary and unwise to require a pecuniary loss instruction for the sole purpose of excluding these elements from jury consideration. To direct the jury, on the one hand, to limit plaintiff's recovery to pecuniary losses alone while also compensating the plaintiff for loss of such nonpecuniary factors as the society, comfort, care and protection of a decedent is calculated to mislead and invite confusion. Instead, a simple instruction excluding considerations of grief and sorrow in wrongful death actions will normally suffice.

We think it significant that the United States Supreme Court (announcing the rule under maritime law) permits recovery in a wrongful death action for the loss of such elements as comfort, love or affection without any accompanying requirement that such loss be deemed to be pecuniary in nature. (*Sea-Land Services, Inc.* v. *Gaudet* (1974) 414 U.S. 573, 587, fn. 21 [39 L.Ed.2d 9, 22, 94 S.Ct. 806].) In *Sea-Land* the high court, in construing the federal Death on the High Seas Act (41 Stat. 537, 46 U.S.C. §§ 761-768), carefully assessed the issue presently before us. It concluded that the weight of state court authority favored recognition of the right of recovery for loss of the decedent's society, even in those jurisdictions which by statutory language or judicial interpretation restrict the remedy to pecuniary loss. Recognizing this national trend and "the humanitarian policy of the maritime law to show 'special solicitude' for those who are injured within its jurisdiction" (p. 588 [39 L.Ed.2d p. 23]), the *Sea-Land* court held that recovery for

wrongful death in an admiralty case could properly be had for the demonstrable and, in a monetary sense more easily measurable, services of the decedent to spouse and child. It is greatly persuasive with us that in doing so the Supreme Court interpreted the term "society" as including "a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection" (*id.,* at p. 585 [39 L.Ed.2d at p. 21]).

We note that in California those elements of recovery sought by Benjamin Krouse herein clearly would be available to him as "consortium" damages in the usual personal injury action for his wife's injuries. (See *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669].) As we explained in *Rodriguez,* " 'The concept of consortium includes not only loss of support or services, . . . [but also] such elements as love, companionship, affection, society, sexual relations, solace and more.' " (*Id.,* at pp. 404-405, quoting from a New York case.)

For all of the foregoing reasons we conclude, accordingly, that the instruction permitting recovery for those nonpecuniary damages herein at issue properly set forth the elements of damage recoverable by Benjamin.

b.) *Award of Wrongful Death Damages for Mental and Emotional Distress to Krouse Heirs.*

Defendant next asserts that the trial court erred in instructing the jury that the Krouse plaintiffs, in their wrongful death action, might recover for mental and emotional distress sustained by them. This argument has merit.

Since the different plaintiffs were asserting three distinct causes of action, the court's instructions on the issue of damages were, of necessity, lengthy and complicated. Adding to the difficulty of framing the appropriate instructions was the fact that both Benjamin and Mladinov, having personal injury claims for themselves, could recover a variety of both general and special damages which were not available to the Krouse children in the wrongful death cause of action. In addition, Benjamin was asserting a claim for damages for his emotional distress (under principles enunciated by us in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]) which claim was unavailable to either the Krouse children or Mladinov. Under circum-

stances such as these the jury instructions on damages must be precisely drawn with careful consideration of the relationships of the parties, the various theories of recovery, and the allowable elements of damages.

The record before us reflects that the court initially instructed the jury that "plaintiffs" could recover for their medical, hospital, nursing care, and related expenses. While the instruction on its face related to "plaintiffs," presumably it was applicable only to the personal injury claims of Benjamin and Mladinov, and should have been so restricted. Moreover, immediately following the giving of such instruction, the confusion was compounded by an instruction to the jury that the "award" should include "[r]easonable compensation for any pain, discomfort, fears, anxiety and other *mental and emotional distress* suffered by the plaintiff and of which his injury— [¶] *I should say plaintiffs.* You have got to remember that *we have a wrongful death and a personal injury here* [¶] *—by the plaintiffs*—and of which their injury was a proximate cause and for similar suffering reasonably certain to be experienced in the future for the same cause." (Italics added.)

This instruction, containing a gratuitous reference to the wrongful death plaintiffs, readily could have led the jury to award damages to Elizabeth's heirs for their present and future mental and emotional distress resulting from her death, contrary to existing law.

Thereafter, the court instructed that Benjamin had a separate action for recovery of emotional distress based upon his presence at the accident scene (a subject discussed in § 2 of this opinion). The court added, however, that "you are further instructed to base your award of damages, if any, in this regard in accordance with my general instructions on the manner by which damages are to be reasonably awarded *the heirs of Elizabeth Krouse,* deceased, or the real parties in this action, and the widower and the children of the deceased." (Italics added.) Once again, although the intent of the instruction is uncertain, the court appears to suggest that an award of damages for emotional distress would be proper in a wrongful death action.

Subsequent instructions (not presently challenged by defendant) stated that the Krouse plaintiffs are entitled to "just compensation for the pecuniary loss which each heir has suffered by reason of [decedent's] death . . ." and that in determining such pecuniary loss the jury was to exclude "[a]ny grief or sorrow of [decedent's] heirs."

Not surprisingly, the jurors returned to the courtroom within an hour after they had retired, and requested a rereading of the instructions on "personal and emotional harm"; significantly, they did not specify the particular plaintiffs to which these instructions applied. The court assumed that the jurors referred to *Benjamin's* claim for emotional distress (perhaps because only he claimed recovery under the principles enunciated by us in *Dillon* v. *Legg, supra*) and accordingly the court reread the instructions on personal injury, emotional distress, and aggravation of original injuries, advising the jury that these instructions pertained only to Benjamin. The court, however, did not clarify or rephrase the wrongful death damages instructions as they applied to the Krouse children; the instructions which were reread were silent on this subject.

California cases have uniformly held that damages for mental and emotional distress, including grief and sorrow, are not recoverable in a wrongful death action. (E.g., *Parsons* v. *Easton, supra,* 184 Cal. 764, 770; *Bond* v. *United Railroads, supra,* 159 Cal. 270, 285-286; *Dickinson* v. *Southern Pacific Co., supra,* 172 Cal. 727, 731; *Munro* v. *Dredging etc. Co.* (1890) 84 Cal. 515, 525 [24 P. 303]; *Ure* v. *Maggio Bros. Co., Inc., supra,* 24 Cal.App.2d 490, 496.) Plaintiffs do not contend for a contrary rule. Instead, they urge that any error committed by the court in instructing the jury on the subject of damages for wrongful death was not prejudicial.

■ Error is considered prejudicial when it appears probable that an improper instruction misled the jury and affected its verdict. (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353].) As we have recently observed, "Whether a jury has been misled by an erroneous instruction or by the overall charge must be determined by an examination of all the circumstances of the case including a review of all of the evidence as well as the instructions as a whole." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 59 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

■ In the present case the inconsistent and confusing instructions on the subject of wrongful death damages must be deemed prejudicial in the light of the whole record. The issue of damages was the *sole* issue tried in this case. The jury disclosed its evident confusion regarding the emotional distress instructions by requesting a rereading thereof. The rereading did not clarify the point at issue. The sizable verdict in favor of the Krouse plaintiffs ($300,000) may very well have included a substan-

tial award for their grief and suffering, a fair assumption in light of the extensive evidence of decedent's injuries, her good character, and her close relationship with her family.

As we have noted, despite the trial court's initial reference to the propriety of awarding present and future emotional distress damages to the Krouse plaintiffs in their wrongful death recovery, a separate instruction was given which correctly explained that grief and sorrow were not recoverable in such an action. The jury was never advised, however, that the initial instruction was incorrect, and thus the jury was presented with inconsistent instructions on the subject. We recently discussed the subject of inconsistent instructions in *Henderson* v. *Harnischfeger Corp., supra*, 12 Cal.3d 663, stating, "We cannot assume that the jury ignored the first instruction and based its verdict solely on the second. 'The prejudicial effect of a *misstatement* of an *important principle of law* cannot easily be overcome by another declaration contradicting it. The jury are bound (and so instructed) to accept the court's instructions as correct statements of the law. . . . They are likely to be confused and misled by the conflicting statements, and it is not easy to determine which charge controlled their determination.' [Citation.]" (P. 673, italics in orig.; see 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 241, and cases cited; *Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465, 470-471 [62 Cal.Rptr. 577, 432 P.2d 193]; *Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929]; *Sexton* v. *Brooks* (1952) 39 Cal.2d 153, 158 [245 P.2d 496].)

Similarly, in the matter before us, we cannot assume that the jury ignored the conflicting instructions on the elements of special damages as between the various plaintiffs and the inconsistent instructions on compensation for mental and emotional distress to the wrongful death plaintiffs. Nor must we presume that they reached their verdicts guided solely by those subsequent instructions which properly expressed appropriate limitations on such damages.

Since we conclude that the wrongful death verdict must be set aside, we do not at this point reach defendant's additional contentions that error was committed in admitting inflammatory evidence, and that the verdicts were excessive. These contentions are discussed below, however, in connection with the Mladinov verdict (§ 3 hereof).

## 2. *The Verdict for Emotional Distress Inflicted upon Benjamin Krouse*

In addition to his participation in the wrongful death action, Benjamin asserted a separate cause of action for himself both for his physical injuries and emotional distress resulting from his presence at the accident scene, and his perception of Elizabeth's death. His physical injuries included a broken shoulder bone and scalp laceration which required sutures. These injuries evidently were not severe for Benjamin was discharged from the hospital on the day following the accident, and his shoulder was substantially healed within a month thereafter.

He also sought recovery for the emotional trauma incident to his witnessing of his wife's death. (See *Dillon* v. *Legg, supra,* 68 Cal.2d 728.) The evidence on this issue was extensive. It included Benjamin's own description of the event, the Krouse children's testimony as to Benjamin's emotional suffering after the accident, psychiatric testimony explaining the psychological therapy necessary to treat Benjamin's severely depressed state of mind, and medical testimony detailing the physical effects of the emotional trauma sustained by Benjamin during this extended period of depression. Cross-examination of the psychiatrist who treated Benjamin disclosed that Benjamin's anger and feelings of retribution toward defendant contributed in part to his condition, although other testimony indicated that the depression due to the loss of his wife weighed more heavily as a cause of his psychological injury.

The following instruction was requested by Benjamin and, over defendant's objection, was read to the jury with respect to Benjamin's claim for emotional distress: "In the event you find that Benjamin Clifford Krouse suffered emotional distress or mental depression as a result of *being present* at the time his wife Elizabeth Krouse was injured on January 20, 1972, you are instructed to award reasonable compensation to Benjamin Clifford Krouse for emotional distress, fright, shock, mental depression, psychological upset, and physical harm associated with the elements of mental distress." (Italics added.) As previously noted, the jury returned a separate verdict in Benjamin's favor for $52,000, presumably representing damages for both his personal injuries and his emotional distress.

Defendant criticizes the foregoing instruction on two grounds. First, he contends that the instruction was inappropriate because Benjamin admitted that he did not actually see his wife being struck by defendant's car nor immediately observe the effect of the

impact upon her. Second, defendant argues that the instruction was an improper statement of the legal principle announced in *Dillon* v. *Legg, supra,* 68 Cal.2d 728, because it permitted recovery on the basis of Benjamin merely being "present" at the accident scene without proof, additionally, that he suffered physical injury as a result of having viewed the accident. We disagree with the first contention and agree with the second.

In *Dillon* v. *Legg, supra,* we held that, "a mother who suffers emotional trauma and physical injury from witnessing the infliction of death or injury to her child" (p. 730) should be permitted to recover damages therefor. In *Dillon,* the plaintiff alleged that she " 'was in close proximity to the . . . collision and personally witnessed said collision,' " (p. 731) and that, as a proximate result she " 'sustained great emotional disturbance and shock and injury to her nervous system' which caused her great physical and mental pain and suffering." (*Ibid.*) In considering whether the foregoing allegations stated a tortious cause of action, we emphasized the primary nature of the element of foreseeability in establishing the essential ingredient of a duty of care, using the following language: "We note, first, that we deal here with a case in which plaintiff suffered a shock which resulted in physical injury and we confine our ruling to that case. In determining, in such a case, whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a *direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident,* as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (*Id.,* at pp. 740-741, italics added.)

We have, subsequently, reemphasized the requirement that the traumatic shock which plaintiff suffers must result in some form of physical injury. In *Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892, footnote 1 [103 Cal.Rptr. 856, 500 P.2d 880], we upheld the rejection of an instruction to the effect that " '. . . a witness to injuries to his child may recover damages for any physical effects upon himself as well as for any mental or emotional distress which he may suffer,' " stating "[t]he refused instruction would permit recovery on an additional

ground: injuries caused to the parents by the mere *witnessing* of the child's suffering. The trial judge properly rejected this latter instruction, which was based upon our holding in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. *Dillon* makes clear that a parent may recover for witnessing a child's distress only if the parent suffers actual physical injury. (68 Cal.2d at p. 740.) The record in the present case, while demonstrating that Kim's parents suffered the emotional distress and mental anguish that is normal for parents of a seriously ill or injured child, does *not* reveal that the parents suffered the actual physical injury necessary for recovery under *Dillon.*" (*Ibid.*; see also *Hair* v. *County of Monterey* (1975) 45 Cal.App.3d 538, 542 [119 Cal.Rptr. 639].)

Decisional law has also imposed on the remedy temporal limitations which flow from *Dillon*'s requirement that the injury result "from the sensory and contemporaneous observance of the accident, . . ." (*Dillon, supra,* at p. 740.) The appellate court in *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253 [79 Cal.Rptr. 723], for example, extended recovery to the mother of an injured child who "did not actually witness the tort *but viewed the child's injuries within moments* after the occurrence of the injury-producing event." (*Id.,* at p. 255, italics added.) Conversely, however, in *Deboe* v. *Horn* (1971) 16 Cal.App.3d 221 [94 Cal.Rptr. 77], the court denied recovery to a wife who was not present at the scene of the accident and was unaware of her husband's injury until summoned to the hospital emergency room. Recovery was also refused in *Powers* v. *Sissoev* (1974) 39 Cal.App.3d 865 [114 Cal.Rptr. 868], to a parent who first learned of the child's injury 30 to 60 minutes after the accident.

We confirm the propriety of the expression in *Archibald, supra,* that the *Dillon* requirement of "sensory and contemporaneous observance of the accident" does not require a *visual* perception of the impact causing the death or injury. In the matter before us, although Benjamin did not see Elizabeth struck by defendant's automobile, he fully perceived the fact that she had been so struck, for he knew her position an instant before the impact, observed defendant's vehicle approach her at a high speed on a collision course, and realized that defendant's car must have struck her. Clearly, under such circumstances Benjamin must be deemed a percipient witness to the impact causing Elizabeth's catastrophic injuries.

In evaluating defendant's second contention, we note that there was substantial evidence from which the jury could find that Benjamin

suffered serious shock to his nervous system causing a gastric disturbance for which he was subsequently treated. This gastric problem constituted a sufficient "physical injury" to qualify under *Dillon* if it can be said fairly that it was caused by Benjamin's shock occasioned by his perception of the collision.

The jury had before it, however, conflicting evidence with respect to the precise cause of the gastric condition. Doctor Dasher, an internist, surmised that the gastrointestinal symptoms were most likely aggravated by Benjamin's "involvement in an accident with his wife." Similarly, Doctor Schmidt, a psychiatrist, testified that Benjamin's severe depression "was brought about by Mr. Krouse's witnessing his wife's death and suffering the loss of his wife." On the other hand, Doctor Schmidt also testified that Benjamin's feelings of anger and retribution were a contributing factor to the latter's state of mind. This latter testimony, together with the fact that apparently there was a remission of Benjamin's symptoms upon his remarriage, could have supported a contrary finding. Doctor Schmidt opined that Benjamin's depression "due to the loss of his wife" contributed more heavily to defendant's condition than such factors as anger or retribution. Doctor Schmidt, however, never established that Benjamin's depression resulted primarily from *witnessing the accident* (as opposed to his sustaining of grief and sorrow incident to her death). Therefore, there remained a substantial question for jury resolution—was Benjamin's physical injury caused by (1) witnessing his wife's death, (2) his understandable feelings of anger and retribution, or (3) his feelings of grief and sorrow over the loss of his wife?

The instruction at issue did not correctly and accurately assist the jury in its critical inquiry, for it permitted Benjamin to recover damages for emotional distress because of his mere presence at the accident scene, without regard to whether or not such distress was caused by the direct emotional impact of his sensory and contemporaneous observance of the accident. (In passing, we note that a correct formulation of the relevant principles is contained in newly adopted BAJI instructions (Cal. Jury Instns., Civ., Supp. Service, pamph. No. 2 (1976) Nos. 12.83, 12.84, pp. 58-60).

Furthermore, the giving of the foregoing instruction, permitting recovery because of Benjamin's merely "being present," coupled with the substantial conflict regarding the precise cause of Benjamin's emotional distress and resulting injuries, was clearly prejudicial. It is

reasonable to assume that a significant portion of the $52,000 award in Benjamin's favor may have been intended by the jury to compensate him for such improper elements as grief, sorrow, anger and retribution. We conclude that the improper instruction probably misled the jury and affected its verdict. (See *Henderson* v. *Harnischfeger Corp., supra,* 12 Cal.3d 663, 670.) It follows, accordingly, that the verdict in Benjamin's favor must be set aside.

### 3. *The Mladinov Verdict*

■ Defendant next contends that the $90,000 verdict in favor of plaintiff Mladinov should be set aside on the grounds that inflammatory evidence was introduced at trial, and that the verdict was instrinsically excessive. As will appear, we agree that some items of evidence were improperly admitted, but we also conclude that the error was not prejudicial and that the verdict was not excessive.

The evidence with respect to the damages suffered by Mladinov reflect that at the time of the accident she was 75 years old. She suffered serious personal injuries including a fractured left leg and pelvis, and she was in shock when brought to the hospital. Her condition required approximately 60 days of hospitalization, and her medical expenses exceeded $12,000. The reduction of her leg fracture required insertion of a metal rod in the leg bone. She developed pneumonitis post-operatively and suffered a partial collapse of a lung. As of the time of trial, her physician described her accident-related residual and permanent symptoms as including a limp, significant external rotation of the foot, and restricted flexion in the knee which would cause difficulty in activities such as boarding a bus. In addition, she experienced a worsening of a preexisting cardiac problem and, at trial, was under treatment for this condition. On returning home, after her hospitalization, Mladinov required assistance for three months due to her inability to get in and out of bed. Thereafter, she employed a walker within the house and a cane for brief walks outside. This permanent condition was shown to have significantly altered and reduced her lifestyle, since before the accident she had been self-sufficient in the care of her home and yard, and thereafter she required help in shopping, house cleaning and gardening.

■ Defendant first contends that photographic, and other, evidence describing the accident and accident scene, and testimony concerning the damaged condition of decedent's body, should have been excluded since it was relevant only on the issue of liability which was

admitted. ▇▇ Evidence which is relevant only as to an issue which is not before the jury should be excluded. (*Fuentes* v. *Tucker* (1947) 31 Cal.2d 1, 7 [187 P.2d 752].) ▇▇ Here, however, although defendant admitted liability, he did not stipulate to the seriousness of the physical injuries sustained by plaintiffs Mladinov and Benjamin Krouse. Photographs of the accident scene and testimony of eyewitnesses were items of evidence reasonably related to the force, degree, and nature of the injury-causing impact, and as such, were properly admitted. Likewise, this evidence bore directly upon Benjamin's claim under *Dillon* v. *Legg, supra,* for damages related to emotional distress.

▇▇ Conversely, evidence of the condition of decedent's body as revealed by the autopsy report, testimony of the autopsy surgeon, and testimony of decedent's daughter regarding the reconstruction required to permit an open-coffin funeral should not have been admitted. This evidence had no bearing either on the wrongful death action of Elizabeth's heirs or on Mladinov's personal injury action; nor would it have been relevant to Benjamin's claim for *Dillon* damages since he did not actually see Elizabeth's condition upon impact. Decedent's physical condition after impact, accordingly, could not have contributed to Benjamin's emotional distress at the time of the accident, and detailed testimony relative thereto was improperly admitted.

▇▇ Defendant argues in this connection that the error was prejudicial because its inflammatory nature resulted in an excessive verdict. We conclude otherwise. It is unlikely that evidence of the extent of *Elizabeth's* injuries would have induced the jury to inflate Mladinov's verdict. As we have indicated, independent evidence as to Mladinov's serious personal injuries would have supported the verdict as to her. Accordingly, unless otherwise affected, the Mladinov verdict should stand.

We note, however, that the verdict may improperly have included an allowance for Mladinov's attorneys' fees, an issue raised in defendant's motion for new trial which we now address.

### 4. *Jury Misconduct*

▇▇ In support of his motion for new trial, defendant offered the declarations of four jurors to the effect that the verdict for each of the plaintiffs had been increased by an amount the jurors estimated would be paid by plaintiffs in legal fees. Each of the four declarations is

identical in content, alleging that "several jurors commented" on their belief that plaintiffs' counsel would be paid one-third of the total award. The declarations further recite that the jury "considered" this belief in its awards to the Krouse plaintiffs, and that the award to Mladinov was "determined" by adding $30,000 for legal fees to the $60,000 the jury estimated Mladinov would require to hire a helper for 10 years.

Plaintiffs moved to strike the declarations on the twin grounds that they contained inadmissible evidence and involved the "mental processes" of the jurors. The trial court agreed, stating its opinion that such declarations were always to be viewed with distrust since jurors are easily subjected to undue pressure by investigators seeking to impeach a verdict. We conclude, however, that the declarations were admissible, necessitating a reconsideration of defendant's motion for a new trial.

Evidence Code section 1150, subdivision (a), provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

We carefully explained in *People* v. *Hutchinson* (1969) 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132], that section 1150 properly distinguishes between "proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved, . . ." (P. 349.) In *Hutchinson* we approved the admission of jurors' affidavits, for purposes defined and limited by section 1150, adding, however, that "The only improper influences that may be proved under section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration. [Citations.]" (P. 350.)

*Hutchinson* involved jurors' affidavits regarding a bailiff's improper statements to the jury, prompting them to reach a premature verdict. Since these remarks were "likely to have influenced the verdict improperly" (Evid. Code, § 1150, subd. (a)), we vacated the order denying new trial and directed the trial court to redetermine the motion in the light of these affidavits. By similar reasoning, if the jurors in the present case

actually discussed the subject of attorneys' fees and specifically agreed to increase the verdicts to include such fees, such discussion and agreement would appear to constitute matters objectively verifiable, subject to corroboration, and thus conduct which would lie within the scope of section 1150. (See also *Clemens* v. *Regents of University of California* (1970) 8 Cal.App.3d 1, 19 [87 Cal.Rptr. 108] [jurors' declarations *re* bias and misconduct of fellow juror].)

The declarations in question are inconclusive, however, and could be construed as conduct reflecting only the mental processes of the declarant jurors, for they assert that certain unnamed jurors "commented" on the subject of attorneys' fees, and that the jurors "considered" the matter in determining the "final compromise award." An assertion that a juror privately "considered" a particular matter in arriving at his verdict, would seem to concern a juror's mental processes, and declarations regarding them, accordingly, would be inadmissible under section 1150. It is not clear from the record whether the jury's treatment of attorneys' fees constituted "overt acts, objectively ascertainable" and thus admissible, or rather may more properly be described as evidence of the jury's "subjective reasoning processes" and thus excludable, all as more fully developed in *Hutchinson.*

■ Generally, it is clear, attorneys' fees are not recoverable in personal injury or wrongful death actions (Code Civ. Proc., § 1021; *LeFave* v. *Dimond* (1956) 46 Cal.2d 868, 870 [299 P.2d 858, 60 A.L.R.2d 939]). ■ An express agreement by the jurors to include such fees in their verdict, or extensive discussion evidencing an implied agreement to that effect, constitutes misconduct requiring reversal. (See *Dunn* v. *White* (1970) 206 Kan. 278 [479 P.2d 215, 219, 47 A.L.R.3d 1289]; *White Cabs* v. *Moore* (1947) 146 Tex. 101 [203 S.W.2d 200, 201-202].) A plaintiff's obligation to pay attorneys' fees is so commonly understood by most jurors, however, that it would be undesirable to require that a verdict be set aside merely because some of the jurors admitted that they privately considered the matter of attorneys' fees in reaching their verdict. (See Comment (1958) 25 U.Chi.L.Rev. 360, 368.)

■ Although the declarations before us are inconclusive regarding the nature and extent of any open discussion or agreement between the jurors regarding the subject of attorneys' fees, they do concur in alleging that the Mladinov verdict was inflated by $30,000 to compensate her for her attorneys' fees. This, of course, is serious matter and, without indicating our own views as to the merits, we conclude that the

declarations, taken together, raise an issue of sufficient moment that, in fairness, the declarations should have been admitted and considered by the court in its ruling upon defendant's motion for new trial. Rather than set aside the Mladinov verdict, thereby necessitating a new trial, however, it is appropriate simply to vacate the order denying new trial and to direct the trial court to admit the declarations and, weighing them in conjunction with all other relevant matters, to reconsider the motion. (See *Clemens* v. *Regents of University of California, supra,* 8 Cal.App.3d 1, 19-22.)

 Plaintiffs have argued that the jurors' declarations were inadmissible in the absence of an affidavit by defendant's counsel disclaiming knowledge of the alleged misconduct prior to entry of the verdict. We conclude that the point lacks merit.

We held in *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 103 [95 Cal.Rptr. 516, 485 P.2d 1132], that such a "no knowledge" affidavit is appropriate where a party offers juror testimony to impeach a verdict. However, we did not then face the issue presently before us, namely, alleged misconduct occurring *after* jury deliberations began. The "no knowledge" affidavit requirement is inapplicable in those cases where, as here, the misconduct consists of events occurring during the jurors' secret deliberations prior to the announcement of their verdict. The rationale for requiring counsel to verify lack of prior knowledge of jury misconduct is to prevent counsel from withholding such knowledge until after an unfavorable verdict is announced, thereby thwarting the trial court's exercise of its discretion in correcting procedural error. Where the facts confirm that counsel could not possibly have known of the alleged misconduct before the verdict was rendered, such a "no knowledge" affidavit is rendered unnecessary. (Accord, *People* v. *Adame* (1973) 36 Cal.App.3d 402 [111 Cal.Rptr. 462].)

We cannot accept the speculative argument that because an unscrupulous party or his counsel may have the means of discovering events occurring during jury deliberations, and that an unidentified few may abuse the jury process, the "no knowledge" rule should apply even in circumstances similar to those herein presented. The statute which makes it a misdemeanor to eavesdrop on jury deliberations (Pen. Code, § 167), vigorously enforced, provides a sufficiently strong deterrent to those who would attempt to invade the secrecy of jury deliberations.

### 5. *Summary*

We conclude that prejudicial error occurred in the instruction of the jury regarding the damages available to the Krouse plaintiffs in a wrongful death action, and to Benjamin Krouse in his separate cause of action under *Dillon* v. *Legg, supra,* 68 Cal.2d 728. With reference to the Mladinov verdict, the trial court should reconsider defendant's motion for new trial based on jury misconduct.

That portion of the judgment in favor of the plaintiff heirs and plaintiff Benjamin Clifford Krouse is reversed; that portion of the judgment in favor of plaintiff Vinka Mladinov is affirmed, subject to the trial court's reconsideration of defendant's motion for new trial on the ground of jury misconduct. The order denying defendant's motion for new trial, as it pertains to the Mladinov verdict, is vacated, and the trial court is directed to conduct a new hearing upon the motion in accordance with the views herein expressed.

Tobriner, Acting C. J., Sullivan, J.,* and Wright, J.,† affirmed.

**MOSK, J.**—I concur generally in the opinion, but I dissent from vacating the order denying defendant's motion for new trial on the Mladinov judgment. The majority are opening the door wide to impeachment of jury verdicts, an area heretofore closed except under circumstances strictly circumscribed by statute.

Defendant submitted four declarations of jurors, signed by one on November 18, by two on November 20 and by another on November 21. All are on the stationery of the law firm representing defendant and are in identical language. All were witnessed by the same individual, presumably a representative of defendant's law firm. Two of the declarants voted for a defense verdict and thus were patently uninfluenced by any purported suggestion to increase the award to plaintiff.

The four declarations asserted that during the deliberations several jurors *commented* that plaintiff's attorney would be paid attorney fees, that it was their *belief* attorneys get one-third of the recovery as their fee, that "in all our *deliberations,* this was *considered* in *determining* the final

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

compromise award." (Italics added.) Using the declarants' own terms, then, we have before us allegations concerning matter *commented* on, the subject of *belief, considered* in *determining* the award.

In my opinion the foregoing constitute mere subjective considerations of four jurors and do not meet the criterion established for impeachment of a verdict in *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132], i.e., "proof of overt acts, objectively ascertainable." In *Hutchinson* there were charges of improper external influence upon the jurors by the court bailiff. (See also *Anderson* v. *Pacific Gas & E. Co.* (1963) 218 Cal.App.2d 276 [32 Cal.Rptr. 328].)

In *Putensen* v. *Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062 [91 Cal.Rptr. 319], there was an unauthorized communication by the trial judge to the jury. Relying on *Hutchinson* and Evidence Code section 1150, the court held that the verdict could not be impeached by jury affidavits the effect of which was to assert the reasoning of the jury based upon the improper communication. Justice Molinari wrote that the affidavits, after reciting the improper message to the jury, consisted "of the inferences which the jurors making the affidavits drew from the judge's statement, notwithstanding they were advised not to concern themselves with the subject of their inquiry." There is a clear analogy to the purported improper consideration here of attorney fees.

In *People* v. *Turner* (1971) 22 Cal.App.3d 174, 183 [99 Cal.Rptr. 186], the jury foreman declared that the jury improperly obtained and used a magnifying glass to examine exhibits and that this broke a jury deadlock. The court held the affidavit was inadmissible because it purported to describe the jury's mental processes.

*Aronowicz* v. *Nalley's, Inc.* (1972) 30 Cal.App.3d 27, 41 [106 Cal.Rptr. 424], is also relevant to the issue at hand. There a juror reported the verdict was based on an assumption there were "about 100 shareholders" and "one million dollars seemed about right for that number of shareholders." The Court of Appeal refused to allow the impeachment of the verdict on a declaration which "intended to show the mental processes by which the verdict was reached."

The latest case on this subject is *People* v. *Lee* (1974) 38 Cal.App.3d 749 [113 Cal.Rptr. 641]. The courthouse janitor had destroyed certain exhibits, certainly a serious matter. The court wrote (at p. 758): "The jurors' affidavits expressed *thoughts* that the exhibits would have helped

them in clarifying the location of certain grease spots, bloodstains, frying pan parts, and the entry of the knife. However, this statement of reasoning processes is not competent evidence to impeach a verdict."

Evidence Code section 1150 permits inquiry into improper influences upon the jury, but issues this caveat: "No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." It seems clear that the code prohibits the very inquiry undertaken here, i.e., into the effect of the statement regarding attorney fees in influencing assent to the verdict and the mental processes by which the verdict was reached.

While the majority suggest the four declarations in this case are "inconclusive," the bench and bar will read the opinion as compelling inquiry into the mental processes by which the jurors arrived at their award. We should forthrightly repudiate that process and thus affirm the denial of the motion for new trial. The declarations are before us and there is no factual issue to be resolved; therefore we can decide this issue as a matter of law, rather than to pass the buck to the trial court.

To require trial courts to review declarations reciting purported thought processes of jurors is certain to produce a deleterious effect upon the finality of jury verdicts. I foresee the likelihood of all unsuccessful litigants, plaintiffs and defendants alike, canvassing jurors hereafter as a matter of policy, in the fond hope of discovering some forbidden element that may have inadvertently crept into jury discussions. Motions thereafter made on the basis of such discovery will seriously impede the expeditious administration of justice.

Clark, J., concurred.

Respondents' petition for a rehearing was denied April 28, 1977. Bird, C. J., was of the opinion that the petition should be granted.