**Shari McASEY, Plaintiff,**

**v.**

**U.S. DEPARTMENT OF NAVY.,et al., Defendants.**

**No. C 00–2063 JL.**

United States District Court, N.D. California.

March 19, 2002.

Judgment Amended, April 2, 2002.

Frank M. Pitre, Niall P. McCarthy, Dean C. Rossi, Cotchett, Pitre & Simon, Burlingame, CA, for Shari McAsey, Robert J. McAsey, Jr., plaintiffs.

Abraham A. Simmons, U.S. Attorney's Office, San Francisco, CA, for United States Department of the Navy, defendant.

Roger Brown, Karasoff & Associates, San Francisco, CA, for National Union Fire Insurance Company, claimant.

## INTRODUCTION

LARSON, United States Magistrate Judge.

Bob McAsey awoke on a June morning, kissed his wife Shari goodbye, climbed into his truck and drove approximately 100 miles to a job site on a Navy base. There, he pulled on his leather gloves, picked up his chipping gun, and with his friend and co-worker Dusty O'Ferrall nearby, started breaking up a concrete pad to dig a trench around an electrical conduit. Within minutes, the metal tip of the tool struck a 4,160 volt power line that nobody knew was there. Bob turned for a second to his companion, whispered, "Dusty?" and collapsed. The foreman called the paramedics, but they couldn't revive him. Bob McAsey was dead.

## PROCEDURAL BACKGROUND

McAsey's widow, Shari, and his adult children, Tammy Marie McAsey Ingle and Robert William McAsey, filed this lawsuit against the electrical subcontractors and the Navy, pursuant to the Federal Tort Claims Act, 28 U.S.C. 2674. Venue is not in dispute. The subcontractors, Tryco Electric and Del Monte Electric, were dismissed following mediation.

On August 20, 2001, Defendant's motion for summary judgment was denied. The court found that there were material facts in dispute, including whether the parties' contract had been modified whether orally or by conduct. The court also ruled that the Navy had a duty to conduct an adequate utilities search, and that the term "utilities search" was not too vague to be interpreted to require an electromagnetic or sonic scan. The court also held that the Navy was not a "special employer," and thus was not immune from certain types of liability. The court also denied the Navy's request for an evidentiary hearing, rather than a trial. (Order Denying Summary Judgment filed August 20, 2001, at 12:21–13:5).

The case proceeded to bench trial beginning on September 10, 2001.

## ISSUES AT TRIAL

The principal issues at trial were: (1) whether the contract between the parties had been modified to shift the responsibility for locating underground utilities from the general contractor, Dillingham Construction,[1] ("Dillingham" or "DCNA") to the Navy; (2) whether the 4,160 volt line which caused Bob McAsey's death could have been discovered by an electromagnetic scan; and (3) whether the failure to locate the power line was the cause of Bob McAsey's death.

The trial commenced on September 10, 2001, was recessed on September 11, 2001, due to the terrorist attacks on the World Trade Center and the Pentagon, resumed on September 12 and concluded on Sep-

---

1. Dillingham was not a defendant in this action. The sole remedy against Dillingham, as the employer, is workers' compensation.

tember 14. Appearing for plaintiff Shari McAsey were Niall P. McCarthy and Tamra J. English, COTCHETT, PITRE & SIMON, Burlingame, California. Appearing for plaintiffs Tammy Marie McAsey Ingle and Robert William McAsey was Craig Needham, LICCARDO, ROSSI, STURGES & McNEIL, San Jose, California. Appearing for defendant United States Navy were Abraham Simmons and Scott T. Nonaka, Assistant United States Attorneys, San Francisco, California. The court hereby issues its judgment for plaintiffs, awards damages, and makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### Background Facts

Robert McAsey, Jr. ("Bob McAsey") was a 55–year–old construction worker employed by Dillingham as a laborer. [Stipulated Facts within Joint Pre–Trial Statement dated August 8, 2001, (herein "Stipulated Facts") Page 3]

On June 14, 1999, McAsey was working on a major construction project at the Naval Weapons Station, Concord, California, when he suffered a fatal electrical shock after his air powered chipping gun penetrated an unidentified underground live electrical cable. At the time of the accident, Mr. McAsey was using the chipping gun to clear concrete from around an exposed conduit. [Stipulated Facts, Pages 4–5]

Dillingham had previously contracted with the Navy to improve an ammunition pier at the Station. As part of that contract, upgrades were to be performed at Substation IA–54 on the Navy premises. Dillingham agreed to: 1) demolish concrete to expose an encased conduit, 2) extend the conduit, and 3) form a new concrete slab over the conduit. [Stipulated Facts, Page 3]

## THE CONTRACT

During the bidding process, potential contractors received specific guidelines to be included in the contract. The solicitation for bids included provisions requiring the contractor to agree to participate in safety meetings, prepare periodic reports on the progress of the job and submit to the Navy's monitoring of the contractor's safety performance. All of the key provisions of the contract were disclosed as part of the Navy's solicitation to which Dillingham and others responded with bids. (*See* Exh. A, Jt. Pretrial Statement, Undisputed Facts ("Undisputed Facts") at 3:19–22)

The Dillingham contract consists of a group of documents, Government's Exhibit A, and comprises a single binder approximately two inches thick.

## MODIFYING THE CONTRACT

In the course of the project, Dillingham dealt with many Navy personnel. However, only the Office of the Resident Officer in Charge of Construction ("the ROICC") had written authority to change the contract and bind the Navy:

Section 00720, page 1, part 1.1

FAC 5252.201–9300, Contracting Officer Authority (Jun 1994) reads as follows:

> In no event shall any understanding or agreement between the contractor and any government employee other than the Contracting Officer on any contract, modification, change order, letter of verbal direction to the Contractor be effective or binding upon the Government. All such actions must be formalized by a proper contractual document executed by an appointed Contracting Officer. The Contractor is hereby put on notice that in the event a Government employee, other than the Contracting Officer, directs a change in the work to be performed, or increases the scope of the

work to be performed, it is the Contractor's responsibility to make inquiry of the Contracting Officer before making the deviation . . .

## UTILITIES SEARCHES: LOCATING UNDERGROUND POWER LINES

At the outset, the contract required Dillingham to locate underground utilities, such as water mains and power lines, using electromagnetic or sonic scans before starting construction:

Section 2302, pages 6–7, part 3.1.3

Underground Utilities

provides:

Location of existing utilities indicated is approximate. The Contractor shall physically verify the location and elevation of the existing utilities indicated prior to starting construction. The Contractor shall contact the Public Works Department at the Station for assistance in locating existing utilities. The Contractor shall scan the construction site with electromagnetic and sonic equipment and mark the surface of the ground where existing underground utilities are discovered.

[Defendant's Trial Exhibit A, Sec. 02302, subsection 3.1.3]

A utilities search meant looking for underground electrical wires by "whatever means are appropriate." [Trial Testimony of Chris Coppinger,[2] Pages 506:13–507:3; Trial Testimony of Sam Evans,[3] Page 673:3–21].

## THE NAVY ASSUMES RESPONSIBILITY FOR UTILITIES SEARCHES

Dillingham was required to notify the Navy before starting work on each phase of the project and submit paperwork, which the Navy had to approve, before the first shovel of dirt was turned over.

Section 01330, subsection 1.3.5(g), of the contract provided that the contractor has the responsibility to

"ensure no work has begun until submittals for that work have been returned as 'approved,' or 'approved as noted', except to the extent that a portion of the work must be accomplished as a basis of the submittal."

In addition, Section 01330, subsection 1.3.8, of the contract stated,

"Submittals marked 'approved as noted' authorize the Contractor to proceed with the work as noted provided the Contractor takes no exception to the notations."

[Plaintiffs' Trial Exhibit 83; Defendant's Trial Exhibit A, Section 01330, subsection 1.3.5(g), Section 01330, subsection 1.3.8]

Dillingham initially proposed to the Navy that the parties engage the services of an outside contractor, Underground Service Alert ("USA"), to locate any underground utilities which the workers might encounter in the course of the project. On July 15, 1997, Dillingham submitted a Health and Safety Plan that stated on page 67,

"Verify the location of underground utilities. Consult General Contractor information or call Underground Service Alert (USA) . . ."

---

**2.** At the time of the accident, Chris Coppinger was Utilities Manager, Naval Weapons Station, Concord, California. He supervised a 10–person crew who operated, maintained, and repaired utility systems, including the electrical distribution system, the water distribution system, natural gas distribution and sewer systems. [Tr. 502:13–503:9]

**3.** Sam Evans at the time of the accident was supervisory general engineer. He was the supervisor of a multi-disciplinary branch that handled design, procured design services, and did facility planning for repair, maintenance, remodeling and construction of all facilities at Concord Naval Weapons Station. [Tr. 630:11–19]

The Health and Safety Plan was submitted pursuant to Section 01570, subsection 1.6.5, of the contract. The submittal form, attached to the Health and Safety Plan, specifically referenced this contract section. The submittal also referred to section SD–08 of the contract which states in part,

"A document, required of the Contractor, ... the purpose of which is to further the quality of orderly progression of a portion of the work by documenting procedures, acceptability of methods ..."

[Plaintiffs' Trial Exhibit 81; Defendant's Trial Exhibit A, Section 01330, subsection 1.6, Section 01570, subsection 1.6.5]

On August 8, 1997, the Navy notified Dillingham that it did not use USA, and that the base personnel would locate underground utilities. The response specifically referenced page 67 of the Health and Safety Plan, and revised Dillingham's proposal to state,

"Base does not have U.S.A. service for utilities location. Contractor must have base locate utilities and/or use detectors."

This response was issued by the office of the Resident Officer in Charge of Construction ("ROICC"), and was signed by Naval Officer Lt. Bernadette Usison. [Plaintiffs' Trial Exhibit 82]

The court finds that the Health and Safety Plan was an integral part of the contract between the Navy and Dillingham. The Navy required Dillingham to notify it before starting work on each phase of the project. Dillingham could not start work until its submittals, including its Health and Safety Plan, had been approved by the Navy. Dillingham submitted a Health and Safety Plan prior to starting work on the pier improvement project where Bob McAsey was killed. In the Plan, Dillingham itself proposed to verify the location of underground utilities, as

provided in the written contract with the Navy.

This submittal was rejected by the Navy, through the office of the Resident Officer in Charge of Construction (the "ROICC" Office). The ROICC revised the Dillingham proposal to state "must have base locate utilities and/or use detectors." This response was issued by the ROICC Office and signed by Lieutenant Bernadette Usison. During the course of the trial, the Navy presented no evidence to contradict that Lt. Usison, as a member of the ROICC Office, had full authority to commit the Navy.

The court therefore finds that the Navy modified its contract with Dillingham, in writing, to assume responsibility for locating underground utilities.

On August 12, 1997, Dillingham sent a request for a utilities search to the Navy which stated,

"We are preparing to drive our first test pile for the project in the next ten days. We understand that the base does not have Underground Utility Service (USA). Please notify your Public Works Division to conduct a utility search around Pier 3 and alert us to any subsurface utilities within this area."

[Plaintiffs' Trial Exhibit 17]

On August 14, 1997, Dillingham resubmitted the Health and Safety Plan incorporating the changes made by the Navy, and the Navy responded that Dillingham should contact the Public Works Division on the base (headed by Chris Coppinger) to locate underground utilities. The resubmittal again referenced contract sections 01570, subsection 1.6.5 and SD–08. The Navy's revision to page 67, which Dillingham agreed to, stated the following,

"Verify the location of underground utilities. Consult the Public Works Division

on base to verify location of subsurface utilities."

[Plaintiffs' Trial Exhibit 83; Defendant's Trial Exhibit A, Section 01330, subsection 1.6, Section 01570, subsection 1.6.5]

On September 3, 1997, the Navy sent a written response to Dillingham's August 14, 1997 resubmittal stating, "Approved as noted. See Comments Inside." The comments did not include any reference to page 67. Again the response was signed by Naval Officer Lt. Bernadette Usison of the ROICC office.

## THE NAVY CONDUCTED ALL UTILITIES SEARCHES

Between August of 1997 and June 14, 1999, the Navy performed three or four utilities searches for Dillingham on this project. The areas in which the searches were performed were the Wetlands, the Pier parking lot, and the Wharf. In at least one of these searches Coppinger, the Navy Public Works Staff Engineer, used scanning equipment. Before the June 14, 1999 accident, Coppinger believed it was his responsibility to perform utilities searches on the subject project. [Trial testimony of Chris Coppinger Tr. 569:22–570:5].

Dillingham at no time performed, nor were they ever requested to perform any utilities searches on this project prior to June 14, 1999. [Trial Testimony of Dale Swedberg,[4] Pages 101:24–103:2, 108:25–109:7; Trial Testimony of Chris Coppinger, Pages 507:16–508:8; Trial Testimony of Jack Leider,[5] Pages, 341:16–342:23] In response to questioning from the court, Coppinger stated that he *used his discretion*

to decide when to use or avoid using electromagnetic equipment in utilities searches. (Tr. 510:23–512:17) (emphasis added.)

This court finds that the Navy's conduct supports the conclusion that it had modified its contract with Dillingham to assume the responsibility for locating underground utilities. The Navy did not deny that it conducted every single utilities search on this project. Nor did the Navy deny that, prior to the accident, Dillingham not only never performed any searches, it was never asked to perform any searches. When and how to locate underground utilities was at the sole discretion of the Navy.

## DILLINGHAM ASKED THE NAVY TO SEARCH SUBSTATION 1A–54

In early May 1999, a month before the accident, Dale Swedberg, the Dillingham Project Engineer, obtained "as-built" drawings from Sam Evans' office. The drawings were dated 1987. They purported to depict the location of underground electrical lines within Substation IA–54, including the area where Bob McAsey was working when he was killed. [Plaintiffs' Trial Exhibit 13; Trial Testimony of Dale Swedberg, Pages 95:22–96:10; Trial Testimony of Sam Evans, Page 665:6–22]

Swedberg testified that in late May he gave a "heads up" to Coppinger that he would be making a request for a utilities search. Coppinger acknowledges that he probably was warned that a request was coming. (Tr. 120:2–3)

On May 11, 1999, Swedberg wrote to the subcontractors that the "Navy would pro-

---

**4.** At the time of the accident, Dale Swedberg was Project Engineer for Dillingham Construction on the Concord Naval Weapons Station project, with two years' experience on that project and six years of experience in heavy construction—bridges, dams and the like.

**5.** Project Manager for Dillingham Construction. At the time of the accident he had five years' construction experience and had been on the Concord Naval Weapons Stations project for two years.

vide marking for the underground utilities."

## MEETINGS

The contractor and the Navy held a series of meetings prior to the start of work on the project. Only two of these will be discussed here, the pre-construction meeting on June 27, 1997, before any work started, and the preparatory phase meeting, the last meeting before the accident, on June 8, 1999, to be discussed further on in these Findings.

The pre-construction meeting was held June 27, 1997. The topics discussed were memorialized in a letter sent from the Navy's contracting officer to Dillingham. (Exh. L, Tr. 172:1–18) Included were the prerequisites for contract modification and the Navy's requirement that it receive notice 15 days in advance of a planned utility outage. (Exh. L, Tr. 172:1–18) The letter states, in relevant part:

3. Matters Concerning Job Site Conditions:

(d) Outages: You must obtain Outage Permits prior to performing any work which will interrupt roads, railroads or station utilities. Your outage requests must be made in writing a minimum of 15 calendar days prior to the date of the desired outage. You cannot schedule or perform any outage-dependent work until you have an APPROVED permit in hand. This will be strictly enforced.

12. Other items discussed:

(c) Any change *of any size* from the original contract must be in writing and signed by a contracting officer. (emphasis in original) (Exh. L)

## ELECTRICAL OUTAGES

Dale Swedberg, the project engineer for Dillingham, asked the ROICC office for a one-week outage at the substation area. Sam Evans, supervisory general engineer for the Navy, explained that a one-week outage wasn't possible, because it would require activating a backup generator. The emergency generator did not have enough capacity to meet the electrical demands of the base on a normal workday. It was also expensive, because the Navy had to have a machinist and an electrician on duty. The Navy agreed only to schedule an outage on a Friday, due to lower demand for power on Fridays.

Most personnel were on a work schedule of four ten-hour days so on Fridays most of the office buildings were virtually empty, with no need for air conditioning or for office machinery to be running. Demand on the generator would be half as much on a Friday as on another weekday.

Consequently, although Dillingham requested an outage for one week, the Navy only approved it for one day, due to the lack of generator capacity and the need to provide additional staffing. [Trial testimony of Evans, Tr. 634:17–636:2]

In fact, the Navy only shifted the Inland area of the base to the backup generator. (The base was divided into Inland and Tidal areas for purposes of electrical coverage. Tidal provided power to the piers and related structures.) In addition to its backup generator, the Navy also had a back-up feeder from PG & E, so it only needed to shut down half the base to accommodate the construction. [Trial Testimony of Chris Coppinger, Tr. 545:3–12]

Eventually, the Navy granted a one-day outage on two separate dates, June 11 and 26, 1999. The first was for the electrical subcontractors to disconnect and remove the old transformer, and the second was to install and connect the new transformer. [Plaintiffs' Trial Exhibit 2; Defendant's Trial Exhibit S; Trial Testimony of Dale Swedberg, Pages 121:12–122:4; Trial Testimony of Sam Evans Tr. 652:23–653:2] The plan was that after the subcontractor removed the transformer, Dillingham

would dig up the concrete pad under the area where the transformer had been located, to extend both the conduit and the concrete pad. [Trial testimony of O'Ferrall, Tr. 616:3–9]

## THE PREPARATORY PHASE MEETING

Prior to the June 8, 1999 preparatory phase meeting, Dale Swedberg went to the work site and painted with white paint around the work area including the concrete pad. The Navy's Public Works Division was to perform the requested utilities search and identify and mark any underground utilities, including electrical wires. [Plaintiffs' Trial Exhibits 1 and 16; Trial Testimony of Dale Swedberg, Pages 118:18–119:6, 146:8–21; Trial Testimony of Chris Coppinger, Pages 565:11–566:9; Trial Testimony of Thomas O'Ferrall, Pages 624:15–625:5] The area outlined by the white paint was where Bob McAsey would be working, as verified by his co-worker, Dusty O'Ferrall:

Q: On Friday, when you started to do the work, did you notice some white paint in your area?

A: Yes.

Q: Did you notice any red markings of paint in your area where you were working or was it just the white paint that you saw?

A: I recall white paint.

Q: Do you recall Dale telling you that that's the white paint that he put down in advance of the utility search he wanted from the Navy?

A: Yes.

Q: And the area that you were working in was within that white paint?

A: Yes.

Q: And within the white paint, was that also part of the excavation work you were doing on the trench as well?

A: Yes.

[Tr. 624:15–625:5]

The Navy attempts to distinguish between the demolition area—the concrete pad where the workers were breaking up the concrete around the conduit, and the excavation area—the area next to the concrete pad where a shallow bed would be dug and new concrete would be poured to extend the pad. In fact, the work area encompassed both the demolition area and the excavation area, and the evidence tends to show that both areas and the combined work of demolition and excavation were considered together and the work expected to coincide. [Trial Testimony of Chris Coppinger, Tr. 533:18–25, 541:6–8, 23, 550:8–14]. The court finds that the Navy's asserted distinction is essentially meaningless, because Chris Coppinger understood that the area to be searched for utilities was where Dillingham employees would be working and that included both the demolition and excavation areas. [Trial Testimony of Chris Coppinger, Tr. 567:4–6].

Q: And so, when Dale Swedberg asked you to do a search, you understood, did you not, that he wanted you to search the area where his workmen were going to be?

A: I knew that he wanted me to search the area where he was going to be excavating and doing demo work, yes. So I guess by implication that would be where his workers were.

*Id.*

## STATUS OF POWER SUPPLY TO 1A–54: UTILITIES SEARCH

On June 8, 1999, the contractors and certain subcontractors met with representatives of the Navy. The work schedule including the power outage and when the power would be restored also were finalized on June 8, 1999, and decisions were

made about the scope of the work to be done while the power was off. Dillingham agreed to notify the Navy if they finished early, so the power could be turned back on.

Specifically, Exhibit 16, the minutes of the meeting, reflects the following:

> Tryco [an electrical subcontractor] stated that once they had removed the transformer and wires, the power could be turned back on. DCNA [Dillingham] interjected that this was not the plan, reminding Tryco that the power would be left off while excavation was performed as requested by DCNA. Tryco agreed. Utilities asked if the power to the substation would need to stay off until 14:30. DCNA stated that they would let Utilities know if the work finished sooner. (Exh. 16)

Coppinger, Evans and Jankowski[6] all testified that Swedberg was the Dillingham employee who requested that the power stay off until the work was finished, and who said he would notify the Navy if the work was completed sooner. Coppinger also testified that he believed it was clear at the meeting that the work to be completed before the power was turned back on was all the demolition and excavation[7] work scheduled for the outage. Swedberg testified that they discussed all the activities required to build the new pad for the transformer and that no specific dates were assigned for completion of each phase [Tr. 182:18–24]. If Dillingham finished sooner, it would notify the Navy so the power could be switched back on. [Tr. 541:6–8] Coppinger also testified that there had been a non-injury electrical accident recently. This made him resolve that

all work needed to be done with the power completely off to either the entire switching yard or to whatever area was being worked on. [Tr. 537:23–538:2]

Dillingham requested and received reconfirmation that once the power to Substation IA–54 was turned back on, the work area behind the switch box would remain de-energized. [Plaintiffs' Trial Exhibit 16] Swedberg was concerned for the safety of his workers and instructed them to treat the work area as "hot" (energized) even when the power was turned off. [Trial testimony of O'Ferrall 607:9–11]

Prior to and at the June 8, 1999 preparatory phase meeting, Swedberg asked Coppinger to "do a utilities search." Coppinger agreed to perform a utilities search. [Plaintiffs' Trial Exhibit 16; Trial Testimony of Dale Swedberg, Pages 119:16–120:9; Trial Testimony of Chris Coppinger, Pages 560:4–10] In response to Swedberg's request, Coppinger reviewed the as-built drawings and informed Swedberg that there were no obstructions in the work area. [Trial Testimony of Coppinger, Pages 559:24–561:1]

Coppinger never told Swedberg (or anyone else at Dillingham) that he only reviewed the as-built drawings, nor did he conduct any other type of utilities search, such as an electromagnetic scan. [Trial Testimony of Chris Coppinger, Pages 579:25–580:7]

The court finds that reliance on as-built drawings is not an adequate utilities search under these circumstances. Indeed as observed by several witnesses, including the Navy's, it is "unwise" and even "a mistake" to rely on as-built drawings for a

---

**6.** Anthony Jankowski was the Project Engineer with the ROICC at Concord Naval Weapons Station from February 1999 through September 2000. At the time of the accident he had served 15 years with the Navy.

**7.** Demolition: The act or process of wrecking or destroying; specifically, destruction, as of a building, by explosives. Excavation: The act or condition of excavating (to make a cavity or hole in, to dig out). *American Heritage Dictionary: New College Edition* 1976.

utilities search on a military base. [Trial Testimony of Anthony Jankowski, Page 730:10–25; Trial Testimony of Sam Evans, Page 673:3–10; Trial Testimony of Dale Swedberg, Pages 100:20–101:2]

There is no evidence that Dillingham made an express request for an electromagnetic scan at the preparatory phase meeting before the accident. Coppinger denies that he was ever asked to perform a scan at the substation. The minutes of the June 8, 1999 meeting (Exh 16) reflect that Dillingham requested a utilities search, but they do not reflect a specific request for a scan. Swedberg did testify, however, that he did not consider the review of drawings to constitute a utilities search. [Trial testimony of Dale Swedberg, Tr. 191:8–15]

There was no expert testimony from either party regarding the meaning of the term "utilities search" in the industry. Coppinger, for the Navy, testified that to him a utilities search, in particular as accomplished by the USA Dig subcontractor, "means to use whatever means are appropriate and applicable to assist in determining the location of underground utilities." (Tr. 507:1–3) Conversely, Swedberg testified that to him, a utilities search is "a scanning of the underground utilities to identify and paint up or mark where those utilities are located so they could be seen above ground." (Tr. 101:14–18)

Not all the utilities searches conducted during the first two years of this contract were the same, or even involved the same equipment. Evans testified that at least one search involved simply crawling under the pier to visually identify a cable, while another involved use of electromagnetic equipment, and yet another could not involve electromagnetic equipment because there were too many abandoned conduits which would have made a scan useless. [Tr. 507:16–508:5]

After the June 8th meeting and before construction began, Coppinger did, in fact, return to the archives and find and review the original as-built drawings. He did not, however, conduct a scan of the yard or any part of it. Coppinger testified that a scan of the area would have required shutting down the power for several hours and locating all known lines. He testified that in his opinion this would not make sense since all of the work Dillingham contracted to do was scheduled to be completed in less than a day. However, Coppinger also testified that turning off the power is the only effective means of preventing electrocution. [Tr. 553:23–554:1]

Q: Is there any way to make it safe to do excavation?

A: In a switch yard?

Q: In a switch yard.

A: Turn off the power.

*Id.*

Before construction began, Coppinger warned Swedberg that if anyone uncovered red concrete during the excavation or demolition, all activity should stop and Dillingham should contact the Utilities Department of the Navy before proceeding. Coppinger testified that red concrete meant that a hidden high-voltage wire was nearby. [Tr. 552:16–553:6]

To sum up the evidence as to the need to shut down the power, Chris Coppinger, a 24–year Navy man, testified that the only absolutely safe way to dig in the area of an electrical substation is to shut off the power, if not to the whole substation, at least to the work area. In addition the only effective way to perform a scan is with the power off. Swedberg, a younger, but still experienced construction supervisor, testified that he would have preferred that his men do the demolition and excavation work with the power shut off, but his request for an outage was severely limited by the Navy.

Consequently Swedberg asked Coppinger for a utilities search, to be sure that his men would be safe, but Coppinger looked only at the as-built drawings, because in his mind, there wouldn't be any digging except when the power was turned off. The Navy assured Swedberg that there would be no power to the work area, even when the power to the rest of the substation was restored. Unfortunately, nobody knew that the C–3 line ran right into the work area under the concrete slab where the transformer stood before the subcontractors removed it. Coppinger did not run a scan, perhaps because he didn't think it would be reliable, perhaps because he thought it was the contractor's responsibility, and perhaps because he thought the power would be turned off anyway while there was any demolition or excavation. A hard working family man died one week before retirement because of this colossal failure to communicate.

## THE FIRST DAY OF CONSTRUCTION AT THE ACCIDENT SITE

On Friday, June 11, 1999, the Navy shut off the power for the removal of Transformer No. 1. The 21kv line (C–1 [8]) was de-energized; the switch box at transformer one was locked in an open position meaning no electricity could travel from switch box number one to the pad that McAsey was working on; and the 12kv line (C–2) was removed. All of these facts were known by the relevant parties, and all of these tasks were completed before Dillingham began demolition and excavation. [Plaintiffs' Trial Exhibit 2 and 16; Defendant's Trial Exhibit S; Trial Testimony of

Dale Swedberg, Page 123:6–14; Trial Testimony of Thomas O'Ferrall, Pages 625:20–626:12]

When Coppinger arrived to disconnect the feeder line, several of Dillingham's employees, including Swedberg, were already on site. Swedberg did not ask Coppinger whether he had completed a scan of the area. [Tr. 192:23–193:4] Swedberg testified that he expected to find paint marking any utilities in the area.

He observed no paint anywhere in the area where he had requested a scan. Although the parties had identified the existence of some copper wires in the excavation area, there was no blue warning paint marking them. [Tr. 192:6–19] Swedberg testified that because Coppinger was at the site and observed the men starting work and didn't stop them—he was reassured that there were no underground utilities in the work area and his workers were safe. [Trial Testimony of Dale Swedberg, Tr. 192:18–193:4].

O'Ferrall testified that after the transformer was effectively disconnected, or "locked out," he began demolition of the concrete around the conduit. This was necessary in order to enable the workers to remove the 12kv electrical cable and extend the pad for the new transformer. The plan was to remove the concrete around the plastic pipe which encased the conduit to make room for a piece of plastic on the conduit to attach another length of plastic pipe to extend the conduit. [Trial testimony of O'Ferrall, 616:3–9]

Although the plan was to complete the demolition in one day, the work went more

---

**8.** Each of the two transformers serviced a different part of the Concord Naval Weapons Station. Transformer 1 received the feeder line first and transformed the voltage from 24Kv to 12 Kv. The output cable exits the slough of Transformer 1 then runs back to the vacuum switch and out to the distribution system for the tidal area of the base. After the feeder leaves Transformer 1, it also is connected directly to Transformer 2. In Transformer 2 the voltage is changed from 21 Kv to 4 Kv. (Def. Findings at 17:11–12; Pltf. Ex. 23)

slowly than expected. [Trial Testimony of O'Ferrall, Tr. 611:9–11] This was not unusual. Often particular segments of the project took longer than anticipated, and the Navy personnel understood this as part of the construction process. [Trial Testimony of Jankowski, Tr. 728:17–729:1]

On the Friday before the accident, McAsey and O'Ferrall came across red concrete in the area of demolition. O'Ferrall said that it was standard operating procedure to notify the Navy, but they assumed that the red paint was for the old high voltage lines they had just pulled out of the ground. [Trial testimony of O'Ferrall, 618:21–619:9]

At the end of the work day on Friday, at least four Dillingham employees concluded that it would be necessary to chip away more of the concrete around the conduit. O'Ferrall, McAsey, Swedberg, and Paul Cruz (Dillingham's Quality Control Manager) agreed to continue digging on Monday, June 14, 1999. They left the work site together and locked the gates behind them. [Trial testimony of O'Ferrall, 617:2–7] They were aware that there was no outage scheduled for Monday, but they had been advised by the Navy that the work area would not have any electrical power running through it. (Undisputed Facts, Tr. 614:20–617:4)

Swedberg testified that he didn't notify Coppinger in person that they would be returning on Monday to complete the work, because Coppinger wasn't at the work site. [Tr. 183:15–20] O'Ferrall testified that when he and McAsey left work on Friday afternoon that Swedberg and Paul Cruz walked out behind them and locked the gates. [Tr. 617:2–8] Swedberg left a telephone message for Coppinger stating that the workers would return the following Monday. [Trial Testimony of Chris Coppinger, Page 581:12–582:4; Trial Testimony of Dale Swedberg, Pages 135:12–136:7]

Sometime after the Dillingham workers finished for the day Coppinger returned to the area to re-energize the substation with the feeder. He testified that he first checked with the remaining Dillingham employees and asked them whether they were finished with their work, and they assured him that they were. No one told him about any change in plans for the following Monday. However, Coppinger could not identify the person he spoke to. [Tr. 544:4–22] Coppinger re-energized the 21kv line (C–1) on Friday, June 11, 1999, after the Dillingham workers had left the work site. [Trial Testimony of Chris Coppinger, Page 562:20–24]

The court finds it unlikely that Coppinger spoke with any Dillingham employees about the status of the work at the end of the day on Friday. Both Swedberg and O'Ferrall testified that they, along with Cruz and McAsey, were the last ones to leave the work site and that they locked the gates behind them. Swedberg testified that he didn't tell Coppinger in person on Friday that they would be returning to work on Monday because Coppinger wasn't at the site. Coppinger's vagueness about these events and who he talked to make it even more likely that his recollection is inaccurate.

No one from Dillingham expected that on Monday there would be any electricity coming from switch box number one to transformer pad number one even though the 21kv (C–1) line had been re-energized on Friday, June 11, 1999. [Plaintiffs' Trial Exhibits 17, 35, 36 and 74; Trial Testimony of Dale Swedberg, Page 140:14–20; Trial Testimony of Chris Coppinger, Page 556:11–557:7; Trial Testimony of Thomas O'Ferrall Pages 621:23–622:12]

Nevertheless, Dillingham instructed the workers on Monday to treat the area as hot Dusty O'Ferrall testified as follows:

Q: Before you and Bob started working that morning on June 14th, Mr.

Swedberg told you to treat the area as hot again?

A: Yes. The area was hot.

Q: He told you that?

A: Yes. The area was just hot. Period.

Q: Same instruction he gave you, or warning he gave you on Friday? Is that how you understood it?

A: I understood that Friday, June 11th, they did a major shutdown to extract the high voltage lines. And then Monday, T–2 was hot. We had already disabled T–1, our immediate work area. But of course, I'm to treat this as hot. We didn't walk nowhere near it.

[Trial testimony of Thomas O'Ferrall, 617:24–618:15]

However, Dillingham's job supervisors, Swedberg and Leider, believed there was no danger. Monday, Leider's youngest brother was working in the same area as McAsey. [Trial Testimony of Dale Swedberg, Page 143:18–144:4, 150:5–11;Trial Testimony of Jack Leider, Page 381:13–25; Trial Testimony of Thomas O'Ferrall, Pages 621:23–622:12;Trial Testimony of Chris Coppinger, Page 559:9–14; Trial testimony of Jack Leider 383:19–384:1] Dale Swedberg, Jack Leider and O'Ferrall all believed that the Navy had conducted a utilities search of the work area at Substation IA–54. [Trial Testimony of Dale Swedberg, Page 132:8–133:4; Trial Testimony of Jack Leider, Page 345:10–24; Trial Testimony of Thomas O'Ferrall, Page 622:9–10]

## THE ACCIDENT

On Monday, June 14, 1999, O'Ferrall and McAsey entered the substation. McAsey started to complete the concrete demolition alone. [Trial Testimony of Thomas O'Ferrall, Page 617:19–23, Trial Testimony of Dale Swedberg, Page 136:22–137:11]. His chipping gun penetrated a live underground wire carrying 4,160v of electricity. Electrocution was the cause of death. [Trial Testimony of Chris Coppinger, Page 556:11–17; Stipulated Facts, Pages 4–5]

## ILLUSTRATION OF EXHIBIT No. 23

The line which killed McAsey was subsequently identified as C–3, coming from transformer two, where the voltage from C–1 was stepped down from 12 kv to 4 kv. [Def. Proposed Findings at 17:11–12.] Line C–3 was characterized as a rogue line. It did not appear nor was it located in the course of any utilities search before the accident on the as-built drawings; Plaintiffs' Exhibit 23 is a copy of the drawing showing the concrete pad where the transformer was originally located. The solid line running diagonally across the pad is the location of C–3 as shown in the drawing. The dotted line which makes a right angle along two sides of the pad and runs directly under where the transformer was located shows the true location of C–3, precisely in the area where McAsey was working. [Trial Testimony of Chris Coppinger, Tr. 556: 6–21].

An underground search with the power off, using radar equipment, would have located line C–3. Coppinger did not perform such a search on Friday before work started, because he believed that there were no unknown lines in the area and because the power was off anyway. [Plaintiffs' Trial Exhibits 13, 23, 34, 35, and 36; Trial Testimony of Chris Coppinger Pages 556:11–17, 573:5–574:3, 574:4–8]

The Navy did not perform an adequate search, because Chris Coppinger relied solely on as-built drawings to locate any underground lines. (Trial Testimony of Anthony Jankowski, Page 730:10–25; Trial Testimony of Sam Evans, Page 673:3–10; Trial Testimony of Dale Swedberg, Page 100:20–101:2). The Navy's failure to conduct an adequate search caused the supervisors and workers from Dillingham to believe incorrectly that the job site was safe, when in fact there was a live electrical line in the area where McAsey was working.[Tr. 184:14–18]

The court finds that the power line which killed McAsey could have been located if a proper utilities search had been conducted. [Trial Testimony of Chris Coppinger at page 572:5–23] Accordingly, the Defendant is liable for damages.

## DAMAGES

Plaintiffs Shari McAsey, Robert William McAsey and Tammy Marie McAsey–Ingle suffered damages as a result of the Navy's conduct. [Plaintiffs' Trial Exhibits 37–41, 48–70, and 72; Trial Testimony of Shari McAsey; Trial Testimony of Robert W. McAsey; Trial Testimony of Tammy Marie McAsey–Ingle; Trial Testimony of Bill Shaughnessey; Trial Testimony of Richard Delfino].

Shari McAsey is entitled to economic and non-economic damages. Robert and Tammy McAsey are entitled to non-economic damages only. Their damages included loss of companionship, household services and, property management services. [Trial Testimony of Robert M. Johnson]

## LEGAL AND FACTUAL BASIS FOR ECONOMIC DAMAGES

■ The widow of a man who has been killed by the wrongful act or neglect of another is entitled to recover the present value of her pecuniary loss. As her husband's heir, she is entitled to recover whatever she was receiving from him at the time of his death, and what she could expect to receive in the future. *McLaughlin v. United Railroads of San Francisco* (1915) 169 Cal. 494, 498, 147 P. 149. As applied in wrongful death actions, pecuniary loss includes loss of what the decedent would have earned and would have used for the support, maintenance and care of the heirs and dependent persons. It includes not only contributions of money, but things purchased with money, such as food, housing, education, medical care, transportation, clothing, entertainment, gifts, and the like. It also includes loss of services such as advice, counsel, instruction, and services in and about the home.

■ In wrongful death actions, damages for pecuniary loss are limited by the life expectancy of the decedent immediately before he sustained the injuries which caused his death. *Redfield v. Oakland Con. St. R. Co.*, 110 Cal. 277, 42 P. 822 (1895). The life expectancy of the deceased is a question of fact for the court to determine based on all relevant factors, including the deceased's health, lifestyle and occupation. *Allen v. Toledo* (1980) 109 Cal.App.3d 415, 424, 167 Cal.Rptr. 270.

■ A mortality table is not conclusive evidence of life expectancy but is one factor to consider with other relevant factors. *Id.* A court may take judicial notice of standard mortality tables. *Froeming v. Stockton Electric R.R. Co.*, 171 Cal. 401, 153 P. 712 (1915). Such a chart is offered in evidence not as proof of life expectancy per se, but as some evidence of life expectancy to be considered with other factors, such as the plaintiff's health and physical condition before he was injured, the hazards of his occupation, and his eating, drinking and smoking habits.

■ A standard mortality table is prima facie evidence of life expectancy. *Townsend v. Briggs*, 99 Cal. 481, 34 P. 116 (1893), or raises a presumption of life expectancy where the plaintiff was in average health and physical condition before he was injured. *Scott v. Sheedy* (1940) 39 Cal.App.2d 96, 102 P.2d 575. In the absence of evidence to the contrary, it is presumed that the plaintiff was in average normal health. *Dallas v. De Yoe* (1921) 53 Cal.App. 452, 200 P. 361.

■ The reduction of an award for future damages to present value is also a generally recognized practice in California. The rate of interest to be applied is a

question of fact for the court to decide in a bench trial. Present value tables may also be used to assist the trier of fact in reducing an award of future damages to present value.

■ The present value of future damages may be shown by expert testimony. If a statistician or an economist has been called to testify to the issue of future damages for lost services, he is generally competent to explain and compute the present value of an assumed loss.

In the case at bar, Plaintiff Shari McAsey does not claim future lost earnings, or money her husband would have contributed from his earnings for mortgage payments, insurance, property taxes, food, furniture and household equipment—since her husband was planning to retire soon after the job on which he was killed. She claims only the value of his household services, home repairs and other property management.

Plaintiff offered as an expert witness Robert W. Johnson, a forensic economist. [Tr. at 393–426]. Mr. Johnson testified that he earned a master's degree in Business Administration from Stanford University with a major in finance and investments, as well as post-graduate training with the Strategic Planning Institute and the American Management Association. He worked on Wall Street as an investment banker and analyst for the firm of Donaldson, Lufkin Jenrette, whose clients were the top 100 financial institutions, including Bank of America and Wells Fargo Bank. He also worked as an analyst and portfolio manager for American Express Investment Management Company in San Francisco, which managed about $700 million in mutual funds. He has also worked in strategic planning in the defense industry. He has published articles in the American Bar Journal, the American Journal for Trial Advocacy, and Trial Magazine. He has co-authored a book for lawyers and co-authored articles on structured settlements, quantifying the value of pensions in divorce actions and how to use an economist in litigation. He has been qualified as an expert previously in approximately six cases in this district and in all other federal and state courts in California. He has also qualified as an expert in courts in forty other states.

The court found this witness qualified as an expert to testify about the value of the economic impact on plaintiff from the loss of her husband. He used the standard methodology relied on by economists in the field. He calculated damages in three categories: household services, home building and repairs, and property management.

In the household services calculation, he took into account that Bob McAsey had provided significant household services over the years, that he built his and Shari's house, that he was extremely skilled with his hands, did numerous household repairs, cooked, cleaned, and raised sheep and pigs for wool and meat each year.

In assessing the value of these types of services, Mr. Johnson used a study by the U.S. Department of Agriculture Bureau of Labor Statistics, measuring the value of the average household services performed by men and women. The typical average household services for men are valued, based on a 40–hour week, at $9,048 per year. This is premised on the usual services performed by an urban or suburban resident, and so the value is according to what it would cost to hire someone to perform those same services.

In fact Mr. McAsey did a lot more than the average suburban resident. Normal chores would include cooking, cleaning, and yard work, after a normal workweek schedule without any evening or weekend time requiring the payment of overtime.

Johnson testified that such a calculation is downwardly biased. Therefore, in his opinion, based on the unusual abilities of Bob McAsey, the estimate of $9,048 per year for his household services is conservative.

Johnson calculated the lost value of Mr. McAsey's household services for 21 years, from age 55, his age at death to 76, which is two years short of his normal life expectancy. The witness verified his calculation by comparing general inflation, medical inflation, interest rates and wage growth to arrive at a reasonable rate of interest while considering all these factors. (See Pl.Ex. 72, admitted for illustrative purposes only) He took the total amount in today's dollars and reduced it by the difference between interest rates and wages, to arrive at a calculation of present value.

In his calculation he included past loss, that is loss from the time of McAsey's death to the date of trial, and future losses from the trial date forward to two years prior to the end of McAsey's expected life. To calculate the total loss, he added the actual past loss to the present value of the future loss. In today's dollars, adjusting for present value, the total was $190,008, reduced to a present value of $179,000.

He used the same method to calculate the value of McAsey's home repair services. He used an estimate which Shari had obtained from a general contractor for the costs of materials and labor, subtracted materials costs, assuming that even if McAsey contributed the labor himself, he would still have to pay for materials. (See Pl.Ex. 38) The total labor costs estimated by Jeff Rea Construction to complete construction of the McAsey home was $38,832.

The last category economic damages was the value of property management services for the three rental houses that McAsey owned and managed in partnership with his son. To assist in this calculation, Mr. Johnson consulted Seltzer Property Management, to obtain a quote for such services. The bid for three or four units ranged from seven-and-a-half to nine percent of gross rentals. The witness then applied the figures to the properties listed in Plaintiff's Exhibit 37,—171 Calvert Court, 602 Walnut Avenue and 410 Barnes, all in Ukiah,—to the gross rental amounts, of $775, $750 and $500, respectively, added them up, annualized them, and obtained a total of $24,000 per year; then he took nine percent of that, as the property management fee, which came out to $2,160. He repeated this calculation for each year from August 1999, when McAsey was planning to retire, to the year he would have turned 70. The total calculation for the market value of property management services was $29,998.

Mr. Johnson calculated the total present value of the economic impact of her husband's death on Shari McAsey to be $246,721 as of the time of trial.

Shari McAsey [Tr. 427–462] testified that her husband was "as healthy as a horse." She also testified that her husband cooked a lot and, for example, that he had promised her that after he retired when she came home in the afternoon from her job at the Post Office that dinner would always be on the table.

McAsey worked in the construction trades all his life and was comfortable undertaking just about any building project. He had transformed their house from a shack full of skunks, rattlesnakes and other wildlife to a comfortable home, built with his own hands, but still unfinished at the time of his death. Plaintiffs' Exhibit 39 shows before-and-after photographs of the garage-workshop that McAsey built, and Exhibit 40 shows him hammering shingles on the house and setting stones in a magnificent hearth around the fireplace. He did all of these projects by himself—from pouring the concrete foun-

dation and carpentry to masonry, trim and wallpapering.

He likewise transformed the land around the house from a patch of bare dirt and weeds to a landscaped lawn replete with handmade rock planters that he built and Shari filled with flowers and plants. He even leveled and graveled their driveway. "He did everything," Shari said.

Nevertheless, more work remains to be done—from finishing the walls and floor of one bathroom, to installing gutters on the house and barn, shingling and painting the sides of the garage, finishing the shingles on the house, and replacing the deck. Shari has obtained an estimate from Jeff Rea, a contractor, for finishing the work (Plaintiff's Exhibit 38). This is the same estimate that the economics expert used in his calculations. She testified that her husband had been working on the house since they were first married, that the work was continuing up to the time of his death, and would have continued thereafter until he was finished.

Shari also verified that she and her husband owned three rental properties, one on their own and two with his son Robert and his wife. He had short term mortgages on the properties and had planned to use the income to supplement his pension. When her husband retired he intended to take over the property management from his son. Shari testified that Bob looked forward to taking the burden off his son, who had a full-time job and young children.

The court takes judicial notice of the standard mortality tables. The court finds that McAsey was in good health and there was no testimony of any illness or habits which might have shortened his life. Neither was there any testimony regarding the relative health risks of working in the construction industry. Therefore, the court adopts the standard mortality tables estimate of his life expectancy and finds that McAsey could reasonably have expected to live another 23 years had he not died as a result of defendants' negligence.

■ The court also takes judicial notice of the federal government's estimates of the value of a man's household services and finds that McAsey provided at least the average level of household services and probably a bit more, given his skill in the construction trades, his past work in and around the property, and his dedication to creating a comfortable attractive home for Shari where they could entertain their family and friends. The court also finds that for the same reasons it is highly probable that he would have undertaken to complete the work on his house, and that the value of his labor in doing so is a valid measure of damages to plaintiff.

If he had retired, which he planned to do soon after the Navy job, the court finds it reasonable to assume that, had he lived, he would have retained the rental properties and used the income to supplement his pension; and from the testimony of his wife, he would have taken over the management of the rental properties from his son.

■ The court accepts as reasonable according to sound financial principles and, therefore, adopts the calculations of plaintiffs' expert, Mr. Johnson, as to the present value of plaintiffs future damages. Accordingly, the total economic impact of McAsey's death on his widow and the value of economic damages to plaintiff Shari McAsey was $246,721 at the time of trial.

## LEGAL AND FACTUAL BASIS FOR NON–ECONOMIC DAMAGES

■ In California wrongful death actions the damages recoverable also include loss of comfort, society, and protection, in addition to compensation for any pecuniary loss caused by the death. *Krouse v. Graham*, 19 Cal.3d 59, 137 Cal.Rptr. 863, 562

P.2d 1022 (1977). (Court properly instructed jury that husband could recover "reasonable compensation" for loss of wife's "love, companionship, comfort, affection, society, solace or moral support, any loss of enjoyment of sexual relations, or any loss of her physical assistance in the operation or maintenance of the home.") *Id.* at 67–70, 137 Cal.Rptr. 863, 562 P.2d 1022.

Plaintiff may recover "lost present and future economic support as well as the pecuniary (as opposed to sentimental) value of such factors as lost comfort, society, companionship, care and protection." *Fox v. Pacific Southwest Airlines,* 133 Cal. App.3d 565, 184 Cal.Rptr. 87 (citing *Krouse,* 19 Cal.3d 59, 137 Cal.Rptr. 863, 562 P.2d 1022) disapproved on other grounds by *Canavin v. Pacific Southwest Airlines,* (1983) 148 Cal.App.3d 512, 196 Cal.Rptr. 82.

 Notwithstanding the fact that it is the pecuniary value of lost society, comfort, and care that is recoverable in a wrongful death action, the California Supreme Court labeled such damages as nonpecuniary because they do not have an ascertainable economic value. *Fox,* 133 Cal.App.3d 565 at 569, 184 Cal.Rptr. 87; *Krouse,* 19 Cal.3d 59, 137 Cal.Rptr. 863, 562 P.2d 1022. To recover for the loss of society, comfort, and care, however, the plaintiff must establish the pecuniary value of such loss, and the amount is quantified in monetary terms. *Fox,* 133 Cal.App.3d 565, 184 Cal.Rptr. 87. Under California law, the damages for wrongful death must be reduced to present value. *Id.*

The United States Supreme Court also permits recovery for loss of comfort, love or protection but without any accompanying requirement that such loss be deemed to be pecuniary in nature. *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 587, fn. 21, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). In suit under Death on the High Seas Act,

Court awarded damages for loss not only of services of spouse, but also society. The Court interpreted the term "society" to include a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection. *Id.* at 585, 94 S.Ct. 806.

 The measure of damages is a factual question. The amount of the verdict is subject to the substantial evidence test. The standard of review is whether the entire record, viewed most favorably to the judgment, was rendered without passion or prejudice. *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 103 Cal.Rptr.2d 492 (appellate court upheld a jury verdict for $8.5 million against O.J. Simpson brought by the parents of Ronald Goldman, despite the defense claim that the highest previous award in California for the loss of an adult child was $2 million.)

 In the case at bar, the court heard extensive testimony from the plaintiffs and many friends of the family regarding the relationship between Bob and Shari, Bob and his children, and Bob and his grandchildren. The court received in evidence numerous family photographs showing Bob and Shari on their wedding day, at parties with friends and family, and of Bob with Tammy and Robert and his grandchildren.

It is apparent from the testimony and the exhibits that the relationship between Bob and Shari was very close—their marriage in July 1983 after a 5 year relationship, was a second chance at romance for both of them; he was widowed, she divorced. At trial many of their friends testified about the amount of time they spent together, their work together on their house, their frequent parties and family gatherings. At trial Shari McAsey described their trips to Hawaii and Mexi-

co. She described their physical relationship as wonderful and how much she missed his kiss, waking up next to him in the morning, and, in general, being married to him. She recalled how he frequently called her on the phone and left her notes. She missed having him as a dance partner. She felt cheated because they had agreed that he would work at jobs away from their home in Ukiah, because jobs in the San Francisco Bay Area paid better. They could save more so that Bob could retire sooner, and they would then be able to spend most of their time together. As a result, he worked away from home. After his death, she felt isolated from their friends, because it was too heartbreaking for them to come around the house which Bob had built and be reminded of his absence.

The relationship between Bob and his children was unusually close, because his first wife, their mother, had died young and he had raised them alone with the help of his parents. Bob and his son were business partners. They owned and managed rental property together. Bob was also very close to his grandchildren. He had told his wife he would skip work if he had to, to attend his grandson Weston's kindergarten graduation. Photographs offered in evidence showed that he took the grandkids fishing and camping, and they rode with him on the tractor.

Bob's children were also close to Shari. His daughter testified that Shari was her best friend. After his death when they were together they were reminded all the more that he was gone. Shari McAsey was deprived of the presence of a loving husband who was about to retire and spend most of his time with her in the home they had built together. Tammy and Robert were deprived of the father who had been their sole parent for most of their lives and the indulgent grandfather of their young children. The court finds that the family unit was changed forever by the untimely death of Bob McAsey.

## II. CONCLUSIONS OF LAW

■ Under the Federal Tort Claims Act, liability and damages are determined by the law of the forum state, here California, with the exception that punitive damages and prejudgment interest are not available. 28 U.S.C. § 2674.

■ Under general principles of premises liability, the landowner's duty toward a person injured on its property because of contact between a movable machine and an electric wire depends on the injured person's status as invitee, licensee, or trespasser. It is well-settled that independent contractors and their employees are generally held to be invitees. Where a defendant is charged with negligence for a breach of its duty of care owed to the plaintiff (or plaintiffs' decedent), liability depends on whether the defendant had knowledge, actual or constructive, that his conduct might endanger another, and that he should have foreseen that it might cause harm to someone.

The court finds that the construction contract did not shift the landowner's duty to the contractor because that portion of the contract was modified in effect by the defendant's conduct.

In a state court wrongful death action against a landowner in which a construction worker was killed when the cable he was holding, attached to a boom truck, touched an overhead high voltage line, the court of appeal held that the landowner owed a general duty of care to persons coming on its land to protect them from the hazards presented by high voltage lines. *Krongos v. Pacific Gas & Electric Co.* 7 Cal.App.4th 387, 9 Cal.Rptr.2d 124 (1992).

■ A landowner has either actual or constructive knowledge of power lines on his property. This rule may be mitigated if the injured party knew or should have known of the dangerous condition separate and apart from specific warnings by the landowner. Neither Bob McAsey nor Dillingham had any independent knowledge, either actual or constructive, of danger from the hidden C–3 line.

■ In this case the court finds that the Navy knew or should have known the location of all electric power lines on the Concord Naval Weapons Station, including C–3, which caused McAsey's death. In response to questioning from the court, Chris Coppinger stated that he *used his discretion* to decide when to use electromagnetic equipment in utilities searches or not. [Tr. 9/13/01, 510:23–512:17] (emphasis added.) In this case he should have used that discretion to conduct an adequate search. Based on the evidence presented, Dillingham was entitled to rely on the Navy to ensure that the workplace would be safe.

Another court held a landowner liable based in part on the fact that the wire causing the injury could readily have been de-energized, although it would have necessitated shutting down the entire plant. The court emphasized that a month earlier the owner had denied a request by the injured party's employer to shut off the power, from which the court concluded that the owner should have known that it would be necessary for subsequent work. It was unreasonable to expect the injured party's employer to have made another request in view of the previous refusal. *Austin v. Riverside Portland Cement Co.* (1955) 44 Cal.2d 225, 230, 282 P.2d 69.

The court finds in the case at bar that the Navy knew that the only way to make the switching yard completely safe to work in was to "shut off the power," in the words of Chris Coppinger. Nevertheless, it denied Dillingham's request for an outage sufficient to complete the work, claiming that if it shut down half the base, it would have to keep additional personnel on hand to monitor the backup generator, and that time would be wasted because they would merely be waiting for the concrete to cure. In light of the Navy's prior refusal to permit an extended outage, it was not unreasonable for Dillingham to proceed with the work without an outage, especially in light of the Navy's assurances that there were no electric lines or other obstructions in the work area itself and that power was effectively blocked from the work area.

The court apportions liability in light of the decision in *Li v. Yellow Cab Co.*, 13 Cal.3d 804, 828–829, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975), and related state court cases. The court applied to the facts and the law in this case the "common sense proposition that when two individuals are responsible for a loss, but one of the two is more culpable than the other, it is only fair that the more culpable party should bear a greater share of the loss." (*American Motorcycle Assn. v. Superior Court* 20 Cal.3d 578, 593, 146 Cal.Rptr. 182, 578 P.2d 899 (1978)).

The court finds the Navy 90% liable and Dillingham Construction 10% liable. In reaching this conclusion, the court considered the relative authority of the Navy and Dillingham, finding that the Navy exclusively controlled the power outages and was responsible in practice for locating all underground utility lines, including the one which caused the death of Bob McAsey. The Navy rejected Dillingham's request for an outage and failed to conduct an adequate search. Dillingham attempted to insure the safety of its workers by requesting a utilities search, as late as June 8 (Plaintiff's Exhibit No. 16), marked the area to be searched, and elicited the

Navy's assurances that the work area would be de-energized, even after the power was turned back on. When the Dillingham workers encountered red concrete in the work area, they and their supervisors reasonably concluded that it marked the high voltage lines which had just been pulled out.

Could Dillingham have explicitly demanded that Chris Coppinger perform an electromagnetic or sonic scan? In fact this method was utilized by the Navy at least once during the project. Would he have ordered it? The evidence indicates not. Could Dillingham have contacted Coppinger about the red concrete and would he then have had the area scanned? More likely not. If Dillingham had contacted either Coppinger or Sam Evans and requested an extension of the power outage on Monday, would that have been effective? The evidence indicates not. The court faults Dillingham at most for not pursuing these options, at the same time it is doubtful that any of them would have altered the tragic outcome.

## SUMMARY

The Navy assumed responsibility for locating underground power lines by changing the Health and Safety Plan submitted by Dillingham pursuant to the contract. The plan document was part of the package of contract documents. It was changed at the request of Lieutenant Usison of the ROICC Office. The Navy performed all the utilities searches during the project, including at least one electromagnetic scan. Dillingham did not perform a single search. Chris Coppinger, on behalf of the Navy, believed it was his responsibility to conduct searches.

Dillingham requested a one-week outage to complete the demolition and excavation work, but its request was denied and the outage was limited to two one-day periods. Prior to June 14, the date of the accident,

Dale Swedberg marked the area to be searched, including the area where Bob McAsey would be working. Coppinger knew where the men would be working and where to search. The Navy had a duty to perform an adequate search. The project was nearing completion and Coppinger believed that an electromagnetic scan would be inconvenient, so instead he relied on twelve year-old as-built drawings, even though such a practice was unwise, indeed a mistake. The as-built drawings did not show the correct location of the C–3 conduit, a rogue line, which in fact crossed under the area where McAsey was working. The as-built drawings erroneously showed it to be outside the work area.

On the Friday before the accident, the workmen had encountered red concrete, which signified the presence of live power lines. The workers and supervisors from Dillingham knew it was standard operating procedure to notify someone from the Navy. However, they reasonably believed that the red paint they saw marked the de-energized power lines which had just been pulled out. There was no negligence by McAsey. There is no evidence which would tend to show that had someone from Dillingham in fact called Coppinger about the red concrete, it would have made any difference.

Would Coppinger have ordered that the outage be extended in order to ensure the workers' safety, in the possible presence of unknown high voltage lines? Sam Evans had previously denied the outage Dillingham had requested. Would Coppinger have scanned the area where the red concrete was found? He didn't believe scans were reliable. Would he have reviewed the as-built drawings once again? Probably, and he would more than likely have concluded, as the workers did, that the red concrete was there to mark the lines which

had just been pulled out. The court finds that, even if Dillingham had contacted Coppinger about the red concrete, it would most likely not have changed the outcome.

On Monday morning, with the power on, but with the Navy having reassured Dillingham that the work area would remain de-energized, McAsey started breaking up concrete around the conduit and within minutes his chipping gun hit C–3, a live power line, which could have been located if an adequate utilities search had been done. Bob McAsey's death was the direct result of the Navy's failure to perform an adequate search, following its refusal to permit the outage Dillingham had initially requested. A scan would have found the line which killed him. His premature death deprived his wife and children of his work and companionship for many years when he should have been with them.

In sum, the court finds:

1. There was a modification of the Navy's Contract with Dillingham, shifting responsibility for utilities searches from Dillingham to the Navy.

2. The Navy assumed a duty to conduct utilities searches that were sufficiently accurate to locate all underground utilities in the work area.

3. The Navy had a duty to Bob McAsey, an employee of an independent contractor, to protect him from the danger presented by a high voltage line on its property.

4. The Navy knew or should have known of the existence and location of the C–3 line, which caused McAsey's death.

5. Neither McAsey nor Dillingham had either actual or constructive knowledge of the danger from the C–3 line.

6. The Navy failed to conduct an adequate utilities search, breaching its duty under the contract and common law.

7. It was reasonable for Dillingham to proceed with work on the IA–54 substation area, even without a power outage, in light of the Navy's prior refusals to grant an outage and the Navy's assurances that the work area would be de-energized, even with power flowing through C–1; the 21 kv line.

8. The Navy's breach resulted in the death of Bob McAsey when Dillingham relied on the Navy's assurances that there were no live power lines in the work area and furthermore that the work area was de-energized even with C–1 energized.

9. The Navy's breach was the proximate cause of the death of Bob McAsey and the damages suffered by plaintiffs.

10. Dillingham was 10% comparatively negligent for its failure to ensure that Coppinger was aware that excavation would continue on Monday. The Navy is thus 90% responsible.

11. Damages:

The value of the economic damages to Shari McAsey is $246,721.

The value of the non-economic damages to Shari McAsey is $3 million.

The value of the non-economic damages to Tammy McAsey Ingle is $1 million.

The value of the non-economic damages to Robert William McAsey is $1 million.

ORDER

In accordance with the findings of fact and conclusions of law by this court, deducting 10% for the comparative negligence of Dillingham, judgment against defendant shall be entered in favor of plaintiff Shari McAsey in the amount of $2,922,048 and in favor of plaintiff Tammy McAsey Ingle for $900,000 and in favor of

plaintiff Robert William McAsey for $900,000.

IT IS SO ORDERED.

## ORDER FOR AMENDED JUDGMENT

Plaintiff Shari McAsey filed her Motion to Correct Computational Error (FRCP 60(a)) in Judgment on March 26, 2002. This court on March 19, 2002 filed its Findings of Fact and Conclusions of Law Following Bench Trial finding defendant United States Department of the Navy liable to Plaintiffs Shari McAsey, Robert W. McAsey and Tammy McAsey–Ingle for damages for the wrongful death of Robert McAsey. The court found that Shari McAsey was entitled to $246,721 in economic damages and $3 million in non-economic damages, for a total of $3,246,721, prior to any reduction for comparative fault. The court then deducted 10% ($324,673) from the combined total for the comparative negligence of Dillingham Construction. The 10% reduction for comparative fault was applied to both economic and non-economic damages awarded by the court to Shari McAsey. On March 20, 2002, the court entered Judgment for Shari McAsey in the amount of $2,922,048.[1] However, under California law, the 10% reduction should have been applied only to the non-economic damages.

California Civil Code § 1431.2(a), known as Proposition 51, provides that economic damages, unlike non-economic damages, are not offset by the comparative negligence of another tortfeasor. *DaFonte v. Up–Right, Inc.* (1992) 2 Cal.4th 593, 600, 7 Cal.Rptr.2d 238, 828 P.2d 140. Pursuant to § 1431.2(a), in any action for personal injury, the liability of each defendant for non-economic damages shall be several only, not joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount. *Arena v. Owens Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1196, 74 Cal.Rptr.2d 580.

The court hereby corrects the error and orders that Judgment be entered for Plaintiff Shari McAsey in the amount of $246,721 for her economic damages and $2.7 million for her non-economic damages, for a total judgment of $2,946,721, plus taxable costs.

IT IS SO ORDERED.

---

1. This Order has no effect on the Judgment as to Robert W. McAsey and Tammy McAsey– Ingle.